**UNITED STATES of America,**
**Appellee,**

v.

**Gerald W. ESKOW and Fred H.**
**Mackensen, Appellants.**

**Nos. 369, 455, Dockets 33128, 33129.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1970.

Decided Feb. 27, 1970.

---

5. *Masonic Country Club of Western Michigan v. Holden*, 18 F.2d 553 (6 Cir., 1927) ;

*Lukens v. United States*, 62 Ct.Cl. 598 (Ct.Cls.1926).

James W. Brannigan, Jr., Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, and Gary P. Naftalis, John H. Gross, Paul B. Galvani, Asst. U. S.

Attys., New York City, of counsel), for appellee.

Herbert Burstein, Zelby & Burstein, New York City, for appellant, Eskow.

Edwin L. Gasperini, New York City (Fred J. Halsey, Jr., New York City, of counsel), for appellant, Mackensen.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and MANSFIELD, District Judge.[*]

MANSFIELD, District Judge:

On November 5, 1968, following a four-week jury trial, defendants Gerald W. Eskow and Fred H. Mackensen were found guilty of using the mails in furtherance of a scheme to defraud eight insurance companies in connection with loans totaling some $2,350,000 to Yale Express Systems, Inc. ("Yale" herein) in violation of Title 18 U.S.Code §§ 1341 and 2, as charged in 31 counts of a 43-count indictment.[1] They here urge that the judgments of conviction entered on December 27, 1968 be reversed on the grounds that (1) the indictment was defective; (2) there was a fatal variance between the indictment and proof; (3) the evidence of fraudulent intent and a common scheme was insufficient; (4) the trial court, after admitting certain evidence "subject to connection," improperly permitted the jury to determine whether the necessary connection had been established; (5) the trial court erred in characterizing credibility as a collateral matter and foreclosing cross-examination on certain matters. For the reasons hereinafter stated we affirm.

The mail fraud charges grow out of defendants' involvement in obtaining loans in 1964 for Yale, of which Eskow was president and Mackensen was the administrative vice-president in charge of the company's accounting department. Yale was both a holding and operating company. Prior to 1963 it had two wholly-owned subsidiaries, Yale Transport, which conducted interstate motor carrier operations, and American Freight Forwarding Corp., the name of which denotes its business. On May 1, 1963, Yale purchased 97% of the issued stock of Republic Carloading and Distributing Company ("Republic" herein), also a freight forwarder.

In March, 1964, Yale commenced negotiations through Eastman Dillon Union Securities Co. ("Eastman Dillon" herein) to borrow money and in that connection furnished to Eastman Dillon its financial statements for 1963 and also apparently for the first quarter of 1964. Eastman Dillon, in turn, forwarded these statements to prospective lenders.

Eastman Dillon was successful in securing loans totaling $2,350,000 from eight insurance companies. In the loan agreements, which were closed on September 30, 1964, Yale warranted that: (1) the financial statements covering its operations for 1963 and the first six months of 1964 (apparently not sent to the lenders) were accurate and fairly presented the financial condition of the company for the periods stated, (2) generally accepted accounting principles had been utilized in preparing the statements, (3) there had been no material changes after June 30, 1964, that would adversely affect the two financial reports, (4) nothing material had been omitted and there were no known facts that might adversely affect the future financial condition of the company.

Eskow and Mackensen made similar representations in certificates signed on September 30, 1964, the day the loan was closed. Each warranted that to his knowledge the financial statements covering 1963 and the first six months of 1964 were true, and that neither knew of anything which might have an adverse effect on the financial condition of the company as presented in the financial

[*] Of the Southern District of New York, sitting by designation.

1. Defendants were convicted on Counts 1 through 5, 7 through 16, and 25 through

40. The remaining counts, some of which also named Norman Goldwasser as a defendant, were severed except for Count 6, which was dismissed.

statements. In November, 1964, pursuant to defendants' authorization, Yale sent another financial statement to the lenders setting forth its operations for the first nine months of 1964 as required by the loan agreements.

The 1963 financial report showed a profit for that year of $1.8 million. The report for the first six months of 1964 showed a profit of $717,000. The nine-month report set the profit at $1.5 million. All of these profit figures were materially false. A reaudit done in 1965 disclosed that instead of realizing a profit in the sum of $1.8 million for the year 1963 the company had lost $1.8 million, and that it had also lost over $5 million for the year 1964. Although no precise breakdown of the loss figures for the first six- and nine-month periods of 1964 was made, a preliminary audit done by Peat, Marwick, Mitchell & Co. ("PMM" herein), independent certified public accountants, showed a six-month loss of approximately $1.5 million and a nine-month loss of approximately $1.8 million.

The gross disparity between the profit announced for the year 1963 and the loss actually sustained that year resulted largely from the omission from the 1963 financial statement of a number of substantial expenses, most of which had been incurred by Republic. As a freight forwarder Republic's principal expense was the employment of motor and rail carriers to move the freight which it had collected and consolidated. Because the carriers usually delayed submission of their bills for such transportation expenses, Republic had followed the procedure of accruing the expenses monthly on the basis of experience and then, upon later receiving the bills, allocating the actual expense back to the month in which the expense had been incurred. This adjustment of accrued to actual expense was accomplished through use of a coding system. Although an under-accrual of expenses for any month could temporarily result in an overstatement of profits for that month, a downward adjustment would be made when the actual expenses were coded.

In December, 1963, Mackensen took steps that drastically changed the foregoing system. First he instructed Irving Goldberg, the chief accountant of Republic, to make an arbitrary reduction of almost $470,000 in the transportation accrual expenses for October and November. At the same time he converted Republic to a modified cash basis of accounting, described as a "fast cut-off" method, under which a date two weeks after the end of each month was fixed as the time for cutting off expenses related to that month, even though many bills for transportation expense were not usually received until much later, simultaneously Mackensen eliminated the system of coding actual transportation expenses, thus making it impossible to allocate actual expenses, upon later receipt of invoices, back to the month in which they had been incurred so as to determine the actual profit for that month.

The arbitrary $470,000 reduction in transportation expense, coupled with the switch-over in accounting procedure toward the end of the year, was later shown to have been the cause, in very substantial measure, of the large overstatement of income for 1963. The figure was further overstated by the fact that in 1963 the Yale Transport terminal in Newark had incurred $438,000 in bills which had not been included at all in Yale's accounts. These invoices were discovered in early August, 1964, in a shoe box in the custody of Norman Goldwasser, chief accounting officer for Yale Transport. Mackensen thereupon directed that they be suppressed, resulting in an additional understatement of expenses for 1963 by approximately $400,000. Lastly, there was proof that the 1963 earnings were further inflated by the failure of Yale to write off at least a substantial part of some $791,000 in accounts receivable which had become uncollectible by 1963.

The gap of more than $2 million between the profit of $717,000 shown by Yale for the first six months of 1964 and

the loss of $1.5 million sustained for the same period and the even greater discrepancy of over $3 million between the $1.5 million profit as against the $1.8 million loss for the first nine months, is attributable in large part to a few major and egregious misstatements made at Mackensen's direction. The first of these occurred in April, 1964, when a draft profit and loss statement for the first three months of 1964, prepared by Goldwasser, indicated a loss for the period of almost $600,000. Mackensen thereupon created a false profit of $273,000 for the quarter by arbitrarily eliminating $600,000 in expenses of Republic and failing to reduce Yale Transport's revenue by $440,000 owed to interline carriers. Another major falsification occurred in June, 1964, when Mackensen directed Goldwasser, who was preparing the monthly financial reports for May, 1964, to credit the company twice for $403,000 in freight revenue that had been received only once. The two items alone—the arbitrary $600,000 reduction of expenses and the $403,000 double-counting of revenue—falsely inflated the company's six-month and nine-month statements by over $1 million.

## I.

### The Indictment

■ Defendants' attack upon the indictment is too insubstantial to require any extended discussion. The allegations, which describe the scheme generally, set forth the essential elements of the violation of 18 U.S.C. §§ 1341 and 2 sought to be charged, as required by Rule 7(c), F.R.Cr.P. As amplified by a series of bills of particulars the indictment was plainly sufficient to inform the defendants of the charge against them, to enable them to prepare for trial, and to preclude double jeopardy. United States v. Debrow, 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953); United States v. Spada, 331 F.2d 995, 996 (2d Cir.), cert. denied, 379 U.S. 865, 85 S.Ct.

130, 13 L.Ed.2d 67 (1964); United States v. Cimino, 321 F.2d 509, 512 (2d Cir. 1963), cert. denied sub nom. D'Ercole v. United States, 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964). Since each mailing pursuant to an alleged scheme to defraud constitutes a separate offense, Badders v. United States, 240 U.S. 391, 393, 36 S.Ct. 367, 60 L.Ed. 706 (1916); Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363, 366 (1965), cert. denied, 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967), the indictment is not vulnerable to a claim of multiplicity.

■ Defendants' contention that the indictment was restricted to charging a scheme consisting of the mailing of false financial statements of Yale, as distinguished from Yale and its subsidiaries, ignores the plain and unequivocal language of the indictment itself which repeatedly charges that as "part of the said scheme and artifice to defraud" the defendants prepared and mailed false statements purporting "to reflect the financial condition of Yale and its subsidiaries." Although Paragraph 1 charges that the scheme was to obtain money by false pretenses from insurance companies who were induced to purchase "Yale's promissory notes" on the defendants' false representations as to the soundness of "Yale," an essential part of the alleged scheme was the use of the false financial statements of Yale and its subsidiaries. Indeed, the allegation of inducement, although relevant, was not an essential element of the crime. The Government was not required to allege or prove that the fraud was successful. United States v. Rowe, 56 F.2d 747 (2d Cir.), cert. denied, Rowe v. United States, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932). It is sufficient to allege and prove a scheme or artifice to defraud coupled with the requisite mailing. United States v. Fromen, 265 F.2d 702, 705 (2d Cir.), cert. denied, 360 U.S. 909, 79 S.Ct. 1295, 3 L.Ed.2d 1260 (1959).

## II.

### SUFFICIENCY OF THE EVIDENCE OF FRAUDULENT INTENT AND A COMMON SCHEME

■ Eskow and Mackensen each assert that the release of the two financial reports (for 1963 and the first six months of 1964, respectively) was not fraudulent, although admittedly perhaps negligent, because each accepted the statements as prepared by the company's internal accounting staff and reviewed by PMM. In support of their contention they rely on certain portions of the record but ignore damaging proof found elsewhere. The jury, of course, was not required to limit itself to the evidence relied upon by appellants and, because of the verdict below, the evidence must here be assessed in the light most favorable to the Government, United States v. Littman, 421 F.2d 981 (2d Cir., Jan. 21, 1970); United States v. Andreadis, 366 F.2d 423 (2d Cir. 1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); United States v. Dardi, 330 F.2d 316, 325 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), and all permissible inferences are to be construed in the Government's favor. United States v. Marchisio, 344 F.2d 653, 662 (2d Cir. 1965); United States v. Dardi, *supra,* 330 F.2d at 325. According to this standard of review the evidence against Eskow and Mackensen is sufficient to support the jury's verdict.

At the outset we recognize, as Eskow urges, that, unlike Mackensen, he was not directly in charge of Yale's accounting activities, and that he may not have been able to grasp all of the finer nuances of some of the financial data before him or to decide, as between conflicting figures, which was right and which was wrong. On the other hand he was no simpleton. He had commenced work with the company in 1938 and by 1963 had risen to the position of president.[2] Yale was a corporation that had been controlled by the Eskow family throughout its existence; even after it went public in 1960, the Eskow family owned 80% of its outstanding stock. Eskow therefore had a strong motive to follow the company's finances very closely and to scrutinize them with care. The record reveals that he did so, not only during the crucial year 1964 but at an earlier period, before he was confronted with the false statements used in 1964. Between July and October, 1963, for instance, he was sufficiently knowledgeable concerning the accounting entry of purchased transportation expense to advise Goldberg that his transportation expense accruals as shown on the monthly statements of Republic were too high. In October, 1963, he issued a prediction to the effect that the combined profit of Yale and Republic for the year 1963 would be about $4 million or $1.00 per share. Thus, as the company's chief executive officer, he did not hesitate to become intimately involved, as well he should, in the company's financial affairs.

Conceding such involvement, Eskow contends that the evidence merely shows that upon being faced with conflicting views of differing experts, which disturbed and perplexed him, he did everything that could be reasonably expected of him, ordering additional studies, seeking to induce the accountants to reconcile their differences, and finally making a good faith though erroneous decision to release figures that turned out to be wrong. Although it is true that he did these things, the record before us contains ample evidence to justify a different view. It reveals that Eskow was made aware of misstatements of such magnitude that the jury was warranted in concluding that he acted with fraudulent intent and in collaboration with Mackensen when he authorized the release of the financial reports.

The major fraudulent items were brought to Eskow's attention by PMM in

---

2. He had taken business courses at N.Y.U. for two years, and had worked his way up within the company, holding jobs as billing clerk, dispatcher, receiving clerk, driver and the like.

a series of meetings in the spring and summer of 1964. As outside auditors, PMM had performed the annual audit of the company since 1960. Robert G. Conroy was the partner in charge, Donald Adams the audit supervisor, Robert Lee the senior accountant assigned to the Yale Transport portion of the audit and Robert Whelan the senior accountant similarly assigned to the Republic portion. Working under them were up to 10 senior and junior accountants.

PMM completed its audit of the year 1963 in March of 1964. It certified that Yale's profits for 1963 were $1.8 million. Eskow was distressed by this figure, which was substantially under the $4 million he had announced publicly as the company's projected profit. He asked PMM to review the company's internal accounting procedures to determine whether they had contributed to the low profit figure. In the course of this review PMM uncovered the various improper accounting techniques and entries which it had failed to notice in its audit of the financial reports prepared by Yale's internal accounting department. On May 8, 1964, Conroy and Adams informed Eskow that they considered the company's published report of income for the year 1963, and the proposed report of a $273,000 profit for the first quarter of 1964, to be "misleading." They further advised him that they were particularly troubled by the conflicting reports by the company's own accounting department, one of which had indicated a loss of $600,000 for the first quarter and was then later revised to show a $273,000 profit by means of questionable adjustments. Eskow reacted by adopting a course he was repeatedly to follow thereafter when confronted with bad news. He asked that additional analyses be made.

At a directors' meeting attended by Eskow and Mackensen on May 14, 1964, Goldberg challenged the elimination of $600,000 from Republic's expenses (for the first quarter of 1964) which had been arbitrarily ordered by Mackensen without any justification. He advised Eskow that the $600,000 deduction was an "improper" one and pointed out that as a result of the company's shifting to the "fast cut-off" method of accounting just before the end of 1963, and its elimination of coding of invoices, all at Mackensen's orders, he believed that the company's liabilities had been "grossly understated." Mackensen testified that following the meeting he had a private conversation with Eskow in an automobile in which he told Eskow that failure either to accept the corrections or to economize could result in the distortion by the published earnings reports of the company's actual earnings. Mackensen conceded that he made the same statement to Eskow again on September 21, 1964, nine days before the loans were consummated.

On May 25, 1964, Conroy of PMM met with Eskow and his special assistant Kenneth Seidel, whom Eskow described as his "eyes and ears," observing that "anything told to Kenny Seidel is similar to telling it to him [Eskow]." Conroy reviewed the substance of an analysis made by himself and Adams which showed that the company had suffered a loss of $1,036,000 during the first quarter of 1964 instead of realizing the profit of $273,000 which had been reported on the books of the company. Regardless of other items that might have been distorted, such as the probable understatement of transportation expenses as a result of the newly adopted "fast cut-off" method of accounting, Conroy noted that no justification had been put forth for the arbitrary elimination of $600,000 in expenses for the first quarter. This item, standing alone, erased any profit for that quarter. It would have required no training as an accountant for Eskow to have recognized the importance of the item and to have had it verified in short order. Yet he took no action to curtail release of the $273,000 profit figure, which was later sent to the prospective lenders.[3]

3. Although the indictment does not specifically refer to the first quarter 1964 financial statement, evidence as to Eskow's knowledge of its material falsity was rele-

Obviously troubled by these revelations Eskow on May 25, 1964, asked PMM to make a special study of the operating figures, reinstating the coding system by which bills could be allocated back to the periods during which the expenses were actually incurred. This study was begun immediately and completed by PMM on July 15, 1964, with the aid of some 75 college students who performed the mechanical work of allocating the expenses under PMM's supervision. It indicated that the company's 1963 expenses had been understated by approximately $1.6 million. This information was conveyed to Seidel. Since Eskow and Seidel had followed the study closely as it progressed, personally interviewing accountants about three times a week, and Seidel was considered by Eskow to be his "eyes and ears," the jury could reasonably infer that Seidel informed Eskow of the results of the study. However, PMM apparently neither submitted a written report nor made any firm recommendations to Eskow.

On July 20, 1964, Yale hired as comptroller Donald Palmer, a former PMM accountant with three years' experience in the trucking industry. On August 2, 1964, Palmer discovered the "shoe box" bills amounting to $438,000, $400,000 representing expenses incurred in 1963, which Mackensen had ordered to be kept off the books for that year. Palmer also uncovered in short order that there had been a double-counting of $403,000 revenue-in-transit in May, 1964, that $600,000 of accrued transportation expenses of Republic for the first quarter of 1964 had been improperly eliminated, and that the 1963 report carried as income $791,000 in accounts receivable that were probably uncollectible. In a three-hour meeting on August 7, 1964, Palmer told Eskow and Seidel of his findings. They discussed the possibility of having to restate the company's 1963 earnings.

The meeting ended with Eskow directing Palmer and PMM to determine by August 13, 1964, what effect the discrepancies disclosed by Palmer would have on the profit figure which Yale proposed to release for the first six months of 1964. The company's internal accounting department had just completed a first draft of the final report for the latter period which showed a profit of $717,000.

Faced with the necessity of filing a six months financial report with the New York Stock Exchange and Interstate Commerce Commission on August 14, 1964, Eskow met on August 13 with Conroy, Palmer and various officers and directors of the company to decide whether or not he should release the $717,000 profit figure shown by the company's internal accounting department for the first six months of 1964. Conroy and Palmer told him that the $717,000 figure was incorrect. They presented their own preliminary profit and loss statement, giving a copy to Eskow, which showed that the company had lost $1,012,000 during the first six months. They conceded that their figures were not final and complete and that further refinements would be required, but pointed out that there was no question about some of the major errors in the company's internal report, including those arising out of the $438,000 in "shoe box" bills, the $403,000 in double-counted revenue, and the arbitrary elimination of certain accounts payable. Although Mackensen attacked their report in other respects and questioned the qualifications of Conroy and Palmer, no one disputed these three major errors which would have drastically reduced the profit shown for 1963 and eliminated altogether the profit for the first six months of 1964. Furthermore, nothing but generalities were put forth by Eskow, Mackensen or anyone else to offset these major errors.

vant to the charge that the defendants prepared a false statement for the six-month period ending June 30, 1964. The same substantial falsely-stated items form the basis of both. Furthermore, the Government in its bill of particulars advised that the term "other false documents" in paragraph 4 of the indictment embraced the statement for the first quarter of 1964.

Thus, aware that the profit figure of $717,000 for the first six months of 1964 was false, Eskow nevertheless authorized its release on August 14, 1964. Recognizing the misleading nature of the figures being released, he simultaneously joined in authorizing Palmer to maintain two sets of books: an offical set forming the basis of the profit figure and a second set known as "memo ledgers" which showed the loss based upon the findings of PMM and Palmer.

Following the August 14 release of the six months report, the evidence confirming the PMM analysis continued to accumulate. On August 25, 1964, Conroy presented to Eskow a more complete report showing that the company had lost $1,615,000 for the first six months, as refined by the inclusion of later expenses. However, these figures were not represented to be final, and for reasons that are unclear he never prepared a final report for the six months period.

On September 30, 1964, Eskow joined Mackensen in warranting to the lenders that the published 1963 financial statement, which showed a profit of $1.8 million, and the published statement for the first six months of 1964, which showed a profit of $717,000, were accurate and that there had been no adverse change and nothing known that would materially affect the financial condition of the company. On November 13, 1964, Yale forwarded to the lenders reports which showed a profit of $1.5 million for the first nine months of 1964 even though both Eskow and Seidel were advised during the same month that the "memo ledgers" kept by Palmer indicated a loss of $1.8 million for the same period.

The foregoing facts entitled the jury to conclude beyond a reasonable doubt that Eskow was repeatedly made aware that the financial reports released for use in connection with the loans did not fairly present the results of operations for the periods involved. Admittedly the

record reveals conscientious efforts on Eskow's part to get at the facts, including his initiation of studies that led to discovery of some of the major errors, his repeated requests for more studies and findings, and his confusion at the quixotic and apparently inconsistent conduct of PMM, Conroy and Palmer.

Although the conduct of PMM and Palmer is not to be condoned, it does not excuse Eskow.[4] Given the quantum and significance of the material errors disclosed to Eskow by Palmer, PMM and others, and that their nature could easily be grasped without any expertise in accounting, the jury was justified in concluding beyond a reasonable doubt that Eskow knew the financial reports for 1963 and the first six and nine months of 1964 to be false, and that in collaboration with Mackensen he acted with fraudulent intent. The same can be said of his authorization of the release on November 14, 1964, of the statement to the effect that the company had earned a profit of $1.5 million during the first nine months of 1964 after Palmer and PMM had estimated that it had in fact lost approximately $1.8 million during the same period.

### Mackensen

The evidence against Mackensen is so overwhelming that no detailed analysis is required. As the administrative vice-president in charge of Yale's accounting department, he was the principal architect of the manipulations forming the basis of the fraudulent scheme. As a first step he reduced Republic's transportation accruals for October and November, 1963 by almost $470,000. He then shifted the accounting procedures to the "fast cut-off" technique, which eliminated the coding of expenses and thus made it more difficult to compare actual expenses against inadequate accruals. It was he who without justification improperly eliminated $600,000 in

4. In the case of Palmer, for instance, the jury may well have concluded that as a recently-employed company subaltern he was shaping the figures to comport with the desires of Eskow and Mackensen.

expenses for the first quarter of 1964 in order to show a profit for that quarter. Thereafter, upon discovery of the "shoe box" bills which would have reduced the company's 1963 profit by $400,000, he ordered them kept off the books. In May, 1964, he created $403,000 in fictitious revenue by permitting revenue-in-transit to be double-counted rather than directing the adjustment that would reverse the prior period's accrual to be made.

The evidence of his involvement fully justified a jury determination that he acted fraudulently and in concert with Eskow.

*Counts 33–40*

■ Counts 33 through 40 of the indictment charge that in furtherance of the alleged fraudulent scheme defendants, on November 13, 1964, caused Yale's financial report for the first nine months of 1964 to be mailed to the lenders. Since November 13, 1964, postdated the loans, which were consummated on September 30, 1964, defendants contend that even assuming an earlier mail fraud the evidence failed to support the charges of mail fraud at the later date, since the fraud had by that time been accomplished.

The argument ignores the lenders' retention of the power to rescind the loans and demand immediate repayment, if any representation or warranty previously made should prove false or incorrect. The loan agreement further obligated Yale to furnish a nine-month statement as of September 30, 1964. The jury could well have concluded that the scheme to defraud contemplated not only the receipt of the funds but the retention of the money over the loan period, and that the false nine-month statement was later mailed to prevent the lenders from exercising their power to rescind, and thus to lull them into inaction. United States v. Sampson, 371 U.S. 75, 81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); Sparrow v. United States, 402 F.2d 826, 829 (10th Cir. 1968); Bliss v. United States, 354 F.2d 456, 457 (8th Cir.), *cert.*

*denied,* 384 U.S. 963, 86 S.Ct. 1592, 16 L.Ed.2d 675 (1966); Butler v. United States, 317 F.2d 249, 255–256 (8th Cir.), *cert. denied* sub nom. Benedec v. United States, 375 U.S. 836, 84 S.Ct. 67, 11 L.Ed.2d 65 (1963); Cacy v. United States, 298 F.2d 227, 230 (9th Cir. 1961); Marshall v. United States, 146 F.2d 618, 621, 157 A.L.R. 241 (9th Cir. 1944).

### III.

#### The Conduct of the Trial

The trial court admitted "subject to connection" against each defendant hearsay testimony concerning conversations and transactions in which the other defendant only was involved. Each now contends that the court improperly permitted the jury to determine whether the connection had been shown.

■ We have repeatedly emphasized that it is for the court rather than the jury to make the initial determination of a preliminary issue upon which competency of evidence depends. United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969); United States v. Dennis, 183 F.2d 201 (2d Cir. 1950), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), *rehearing denied,* 342 U.S. 842, 72 S.Ct. 20, 96 L.Ed. 636 (1951), 355 U.S. 936, 78 S.Ct. 409, 2 L.Ed.2d 419 (1958); United States v. Ragland, 375 F.2d 471, 478–479 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); United States v. Stromberg, 268 F.2d 256, 266 (2d Cir.), *cert. denied* sub nom. Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L. Ed.2d 102 (1959); United States v. Nuccio, 373 F.2d 168, 173 (2d Cir.), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623, *rehearing denied,* 389 U.S. 889, 88 S.Ct. 16, 19 L.Ed.2d 199 (1967). In this case that determination was whether a common scheme or plan was sufficiently established by independent proof to permit the jury's consideration of evidence received "subject to connection." There can be no doubt that the jury had before it binding proof from

which it could find the common scheme that was charged.

 Although the trial judge initially indicated doubt as to his responsibility, sometimes stating that the jury would ultimately determine the issue, the record reveals that despite his ambivalence he finally made the decision before the case was submitted to the jury. At the close of both the Government's case and the defendants' case, he denied defendants' motions to exclude certain extrajudicial statements received subject to connection. He further indicated that he himself had made the determination by striking as unconnected certain conditionally admitted statements and by the fact that he did not instruct the jury that it was to make the determination or to consider certain evidence only if it preliminarily decided that a connection had been established.

There is no merit to defendants' further contentions that the trial court committed error in characterizing as "collateral" certain cross-examination of Palmer aimed at his credibility and in restricting cross-examination of both Conroy and Palmer. Defendants' counsel were afforded the opportunity, of which they made extensive use, to engage in broad and exhaustive cross-examination of both witnesses. Their cross-examination, for instance, covers 688 pages of the transcript as against 461 pages devoted to the direct examination. A great deal of impeachment matter was elicited, which enabled defense counsel in their summations to argue at length that defendants were the victims of ineptitude on the part of PMM and Palmer. Judge Cannella properly sustained objections to further exploration into details that could have only gilded the lily.

The trial judge's characterization of credibility as "collateral" represents but a passing reference in the course of examinations of Conroy and Palmer covering more than 1100 transcript pages. Even if this needle in the haystack be dignified as error, it was cured by the judge's later charge in which he fully instructed the jury as to their function in evaluating the testimony of the witnesses and specifically directed their attention to the significance of prior inconsistent statements.

The defendants were accorded a full and fair trial. The judgment of conviction must therefore stand.