Hans **MOELLER** and Inge Moeller, Plaintiffs,

v.

Jerome **ZACCARIA**, Sr., Felice Mingione, Frank Branca, and Ivan Friedmutter, Defendants.

No. 91 Civ. 3781 (GLG).

United States District Court, S.D. New York.

Aug. 30, 1993.

Cuddy & Feder, White Plains, NY (Ann Farrissey, of counsel), for plaintiffs.

Kurzman & Eisenberg, White Plains, NY (Guy R. Fairstein, of counsel), for defendant Zaccaria.

Fusco, Carlin & Spizzirro, Yonkers, NY (Louis M. Spizzirro, of counsel), for defendants Branca and Mingione.

Mintz & Fraade, P.C., New York, NY (Alan P. Fraade, of counsel), for defendant Friedmutter.

### OPINION

GOETTEL, District Judge.

## I. FACTUAL BACKGROUND

Plaintiffs Hans and Inge Moeller sue defendants Jerome Zaccaria, Felice Mingione, Frank Branca, and Ivan Friedmutter for injuries stemming from a purported conspiracy to defraud plaintiffs and the general public in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1964 and Connecticut's laws against fraud.

The Moellers, who reside in Greenwich, Connecticut, desired to construct an addition to their single family home and remodel their kitchen. In January and April 1985 they received promotional brochures in the mail from Remodelling Consultants, Inc. ("RCI"), a New York corporation that described itself as a "professional design-build firm," advertising their services as remodelling consultants specializing in home improvements and remodelling. The brochures that plaintiffs received were part of a broader mailing to the general public.

In response to the initial promotional brochure, plaintiffs telephoned the offices of RCI in Mamaroneck, New York to request additional information about RCI's services. Defendant Frank Branca, an RCI representative, contacted plaintiffs by telephone at their Connecticut residence and allegedly described RCI as a "professional design-build firm" that would build an addition to plaintiffs' home designed by two of RCI's licensed architects. In addition, plaintiffs were allegedly told that all the work would be supervised by licensed architects.

A series of telephone calls ensued between plaintiffs and Frank Branca during which these representations were allegedly repeated. Plaintiffs claim that each defendant had a hand in this scheme. Plaintiffs eventually signed a contract with RCI on August 28, 1985 at which time plaintiffs tendered a downpayment of $8,240. Zaccaria was a shareholder, director, and officer of RCI. The other named defendants, Friedmutter, Branca, and Mingione were employees of RCI and also alleged to be shareholders and officers.

According to Zaccaria, RCI maintained a staff of architects in its architectural department as well as several registered architects employed in its sales force who were referred to as "licensed architectural consultants." Persons in the sales force who were not registered architects, including Larry Zeug and defendant Friedmutter, were designated "architectural consultants." Defendants claim that sales people in the latter category were never held out to the public as registered architects.

Plaintiffs claim that a series of fraudulent misrepresentations were made by defendants to induce them to sign a contract with RCI. Plaintiffs tendered a downpayment of $8,240. In particular, plaintiffs contend that since 1985 defendants have repeatedly misrepresented that Lawrence Zeug and Ivan Fried-

mutter were licensed architects who would design and supervise construction of their addition and kitchen remodelling.

In October 1985, Inge Moeller signed an application to the Town of Greenwich Division of Buildings for the issuance of a building permit for construction of the addition to their home. The application was filled out at RCI's offices. In it, RCI was identified as the "Authorized agent and permittee." On behalf of RCI, the application was signed twice by Eric Jacobsen above the lines marked "Permittee" and "Agent."

As part of the application, a line reads "If architect or professional engineer give Connecticut registration No." The space for the information beside the line was left blank. Inge Moeller contends that when she signed the application she did not notice the absence of architect's registration number. The permit was issued nine days later.

In January 1986, at a meeting with defendant Friedmutter, the Moellers initialed the plans for their addition which consisted of five pages of print drawings. The plans contained a signature space for an "architect." The space opposite the word "architect" was blank. Below it, next to the words "Drawn By" is listed the name "E. Jacobson." Plaintiffs claim not to have noticed the absence of an architect's name on the plans they signed.

In the margin of a letter the Moellers received from Ivan Friedmutter, RCI's Westchester Sales Manager, dated December 20, 1985, plaintiff Hans Moeller made a written notation that "delay due to RCI's layoff of architects" and "Ivan [Friedmutter] told us this when drawings were signed." Inge Moeller was told the same thing by defendant Frank Branca. Plaintiffs made no further inquiries concerning the architects or supervision of their additions.

Construction commenced in March 1986. RCI ceased work, however, the following month due to disputes over changes in specifications made by plaintiffs. By that time, plaintiffs had lodged numerous complaints with RCI about the poor quality of the work being done on their home. After a meeting between plaintiffs and RCI representatives including Zaccaria, an agreement was reached in May 1986. The Moellers paid approximately $12,000 into escrow and work recommenced. Before long, problems in the construction resurfaced. Plaintiffs complained of inadequate supervision and shoddy work. Work stopped again in June 1986.

In December 1986, the Moellers commenced suit against RCI for damages in New York Supreme Court alleging fraudulent inducement of contract and breach of contract. While preparing for state trial, plaintiffs' attorney, at the suggestion of an architect retained by plaintiffs as an expert witness who examined the plans for the addition, contacted licensing officials in New York and Connecticut. He learned that Zeug and Friedmutter were not, and had never been, licensed architects.

Acting on information furnished by RCI regarding the design error in the roof support of the addition, the Town of Greenwich refused to issue a Certificate of Occupancy and required that the area be sealed off until substantial repairs were made. Defendant Zaccaria also contends that in 1989, during a visit to the Moellers' home, he personally observed two problems, a roof beam support error and an improperly set curtain wall in the foundation. Zaccaria says that he informed plaintiffs of the defects and offered to correct it at RCI's expense.

On August 2, 1991, the day before the state trial was set to begin, RCI filed for bankruptcy protection under Chapter 11 in the Bankruptcy Court for the Southern District of New York. The bankruptcy was converted to a Chapter 7 bankruptcy in October 1991. In June 1991, plaintiffs filed the present action against the six individual defendants alleging that defendants' fraudulent actions constituted a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1964. Plaintiffs included pendent state claims for common law fraud. According to plaintiffs, the named defendants were all principals, shareholders, and/or management of RCI who participated either directly or indirectly in the brochure mailings.

Plaintiffs seek $750,000 in damages for the RICO cause of action and $1.25 million in

damages for the common law fraud cause of action (which includes $1 million in punitive damages) together with costs and attorney's fees. On October 3, 1991, plaintiffs amended their complaint to discontinue their action against two of the original defendants and detail with greater specificity the nature of their claims.

Before the court today are the defendants' motions for summary judgment and plaintiffs' cross-motion for summary judgment. Defendants argue primarily that the plaintiffs' RICO and fraud claims are barred by the statute of limitations. Plaintiffs contend that defendants use of the term "architectural consultant" constituted fraud as a matter of law.

## II. DISCUSSION

At this point, the standards for resolving a motion for summary judgment border on common knowledge. To prevail, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our function is not to resolve disputed issues of facts but solely to determine if such genuine issues of fact exist. We resolve all ambiguities and draw all inferences in favor of the party defending against the particular summary judgment motion in question. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

### A. RICO Statute of Limitations

Although not entirely clear, it appears that plaintiffs § 1962(c) RICO claim alleges that defendants formed an enterprise to use non-architects fraudulently passed off as architects, to design and supervise home remodelling projects. In furtherance of their scheme, defendants allegedly committed acts of mail and wire fraud that misrepresented the professional qualifications of the employees who would design a customer's project.

■ In a RICO action, the injury alleged must have been proximately caused by a pattern of racketeering activity violating § 1962 or by individual RICO predicate acts.

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). When plaintiffs allege fraudulent representations in the context of an alleged RICO predicate act of mail or wire fraud, those misrepresentations must have been relied on, *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), and plaintiffs must show that their injuries resulted from such misrepresentations. *Ferndale Corp. v. Schulman Urban Dev. Assoc.*, 758 F.Supp. 861, 866 (S.D.N.Y.1990) (citing *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir.1990)). Here, plaintiffs must prove that they suffered injuries proximately caused by defendants' alleged misrepresentations regarding the professional qualifications of the employees who were to design and supervise construction of their addition.

■ The parties agree that RICO is governed by a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Defendants contend that plaintiffs' § 1964(c) civil RICO claim is barred by this statute of limitations since the claim was not raised until plaintiffs filed their federal action in June 1991. Plaintiffs respond that their RICO cause of action was timely filed because it only accrued in January 1991 when they discovered that defendants Zeug and Friedmutter were not licensed architects despite their titles of "architectural consultants." Plaintiffs also claim that they did not actually discover the design defect in the addition's roof until this time.

Plaintiffs somewhat misapprehend the key inquiry in determining when their RICO claim accrued by focusing on their discovery of the details of the alleged fraud scheme. In their brief, plaintiffs include the point heading that reads: "The Moellers' Civil RICO Claim Accrued at the Time the Moellers Discovered or Should Have Discovered the Violation." Pl.'s Brief at 4. This statement is legally incorrect. The Second Circuit, in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), held:

each time plaintiff discovers or should have discovered *an injury* caused by defendant's violation of § 1962, a new cause of

action arises as to that injury, regardless of when the actual violation occurred. A plaintiff under *Malley–Duff*, must then bring his action within four years of this accrual to recover damages for the specific injury. Naturally, as with all rules of accrual, the standard tolling exceptions apply.

*Id.* at 1105 (emphasis added). In short, "congress tied the right to sue for damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property' from the violation." *Id.* at 1103.

The starting point of the four-year limitations period is not when plaintiffs discovered the fraud that serves as the basis of their RICO claim but when they discovered or should have discovered the *injuries* to their property arising from it. Injury, for purposes of RICO, means injury to a person's business or property. *Id.* at 1102. To the extent both plaintiffs and defendants focus on when the plaintiffs should have discovered that the architectural consultants were not licensed architects, they confuse the inquiry.

Plaintiffs allege two types of injuries relevant to their RICO claim: loss of monies paid to RCI and the structural defects in the addition for which plaintiffs seek in total some $250,000.[1] For purposes of accrual of their RICO claim, the relevant inquiry is when plaintiffs discovered or should have discovered these two injuries. Discovery of the alleged fraud regarding Zeug and Friedmutter's status as licensed architects does not commence the four-year limitations period because their professional status is not itself an injury to property suffered by plaintiffs. As we said, it is discovery of the injury, not the fraud, that starts of limitations clock running.

■ It is undisputed that plaintiffs knew of their payments to RCI as soon as they were made. Plaintiffs' last payment made to RCI, totalling some $12,000, was paid into escrow in May 1986 and has yet to be returned. The statute of limitations period for

a RICO claim based on their loss of money ended in May 1990, a year before the present action was commenced.

■ Determining when the claim accrued for the structural defect in the addition is more difficult. Defendants concede that an error was made in the roof design for the Moellers' addition. They deny, however, that either Zeug or Friedmutter, one of whom produced the "shape and form drawing" for the Moeller addition, had anything to do with the working architectural drawings containing the design defect.

Plaintiffs claim that they did not actually know of the design defect in their roof until January 1991 when an expert retained for their state action was asked to evaluate the construction problems with the addition. The operative question becomes when should plaintiffs have discovered the design defect in the roof. In 1989, two years before this action was commenced, plaintiffs met with defendant Zaccaria in their home (and actually sat in the living room addition) at which time Zaccaria observed the serious nature of the structural problems with the addition. There is no doubt that plaintiffs were aware by 1986 when they filed suit against RCI that a myriad of problems existed regarding the construction of the addition. Yet, the fact that the roof beam support error was not noticed until Zaccaria observed the roof might support plaintiffs' contention that the structural defect in the roof was only apparent to the trained eye, and therefore the claim would not have accrued until 1989 when Zaccaria informed them of the defect.

On the present record, we are unable to say as a matter of law when plaintiffs should have discovered that a design flaw in the roof was part of their troubles. Uncertainty regarding the true state of any material fact will defeat a summary judgment motion. *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir.1982). Without knowing when the design defect injury accrued, we cannot hold that plaintiffs' RICO

---

1. Any RICO claim based upon injuries to their home related to problems with the construction or workmanship would be barred by the statute of limitations. Plaintiffs have known all along of the construction problems experienced at their home and almost since the day construction in 1986 began have complained of them to RCI.

claim is barred by RICO's four-year statute of limitations.

### B. Statute of Limitations for Fraud

■ The parties agree that Connecticut's three-year statute of limitations applies to plaintiffs' pendant fraud claim. *See* Con.Gen. Stat. § 52–577 [2]; *Klock v. Lehman Bros. Kuhn Loeb Inc.*, 584 F.Supp. 210, 215–16 (S.D.N.Y.1984). Plaintiffs' claim is thus untimely if the fraudulent acts alleged by plaintiffs accrued before June 1988.

Plaintiffs argue that their claim is timely since allegedly fraudulent mailings to the Moellers continued into December 1989. This is plainly incorrect. Any fraudulent representations made in 1989 had no deceptive impact on plaintiffs and proximately caused no injuries. All work on the addition ceased permanently in June 1986. RCI never resumed work on the addition. In December 1986, plaintiffs commenced their state court action against RCI alleging fraud. The monetary and property injuries suffered by plaintiffs cannot therefore be traced to their reliance on any communications by defendants made after 1986. Absent some reason to toll the statute, plaintiff's fraud claim must be dismissed as untimely.

Plaintiffs, however, argue that defendants' fraudulent concealment merits tolling Connecticut's three-year statute of limitations. They contend that defendants were aware that the term "architectural consultants" was being used by persons other than licensed architects. Plaintiffs contend that term was self-concealing by its nature, and defendants never informed them that architectural consultants were not licensed architects.

Connecticut law allows for equitable tolling of a statute of limitations for fraudulent concealment. Section 52–595 of the General Statutes provides:

If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

Conn.Gen.Stat. § 52–595. To merit tolling under this provision, plaintiffs must show that:

defendants were aware of the facts necessary to establish this cause of action; ... and that they intentionally concealed those facts from the plaintiffs ... The defendants' actions must have been "directed to the very point of obtaining the delay [in filing the action] of which [they] afterward [seek] to take advantage by pleading the statute.

*Bound Brook Associates v. City of Norwalk*, 198 Conn. 660, 504 A.2d 1047, 1050–51 (Conn.), *cert. denied*, 479 U.S. 819, 107 S.Ct. 81, 93 L.Ed.2d 36 (1986).

■ The fact that defendants never stated outright that "architectural consultants" were not licensed architects does not justify tolling the statute of limitations. Since plaintiffs were not in a fiduciary relationship with defendants but rather an arms-length contractual relationship, affirmative acts of concealment are required; mere silence will not do. *Day v. General Electric Credit Corp.*, 15 Conn.App. 677, 685, 546 A.2d 315, *app. denied*, 209 Conn. 819, 551 A.2d 755 (1988).

The crucial question is whether the defendants affirmatively concealed the professional status of its architectural consultants. There is no evidence in the record that any of the defendants ever stated that Zeug or Friedmutter were licensed architects. As presented in their brief, plaintiffs' argument rests on the defendants' continued use of the term "architectural consultant."

The term is somewhat ambiguous, especially when viewed in the context of the duties performed by RCI's architectural consultants. Defendants point out that plaintiffs received from RCI, as part of a packet of materials given to prospective customers, a reprint of an article about RCI published in "House and Home" magazine. Mr. Moeller admitted receiving this article from RCI in 1985. At his deposition, however, he wavered on the issue of whether he read the

---

**2.** Section 52–577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

article, first admitting that he had read it after receiving it from RCI but later saying that he did not remember reading the portion of the article that explained that "consultants" was a term used by RCI to identify its salespeople. *Id.* at 10. Either way, the article itself does not clear up the ambiguity that exists regarding the term. It does not say that RCI's salespeople are referred to as "architectural consultants." It only says that its salespeople are called "consultants."

Thus, we return to the question of whether defendants' continued use of the term, which plaintiffs now challenge as fraudulent, represented acts of fraudulent concealment. Defendants plainly knew that such persons were not part of their staff of licensed architects. However, mere repetition of the term "architectural consultant" represented no new act of concealment aimed at forestalling plaintiffs bringing suit. Nor did it obstruct plaintiffs from discovering the fact that they were not architects. To accept plaintiffs' argument would mean viewing the underlying fraud as an act of concealment itself. In fact, this is the crux of plaintiffs' argument on self-concealing fraud which we address below.

Indeed, plaintiffs were never deterred from commencing suit. In 1986, they commenced an action for fraud in state court. When RCI filed for bankruptcy, plaintiffs filed a federal action against the present defendants. The delay in bringing the present claims under RICO and common law fraud had nothing to do with any active concealment by defendants and everything to do with the automatic stay that resulted from RCI's bankruptcy, and the likelihood that they would be no recovery from the insolvent company. Further, had plaintiffs pursued discovery in the state case more expeditiously, they would undoubtedly have discovered that Zeug and Friedmutter were not licensed architects.

Ultimately, plaintiffs rest their tolling argument on the notion that "architectural consultant" is a "self-concealing" term. In *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988), the Second Circuit held in the context of an anti-trust suit that fraudulent concealment may be proved "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Id.* at 1083.

In *Hendrickson Bros.*, the court stated that "[t]he passing off of a sham article as one that is genuine is an inherently self-concealing fraud, whether what is passed off is a fake vase sold as a real antique ... or a collusive bid purporting to reflect genuine competition." *Id.* (citations omitted). The court went on the describe how a bid-rigging conspiracy to be successful requires, by definition, concealment and is likely to exist for an extended period of time where subsequent fraudulent bid-rigging amounts to an affirmative concealment of the underlying scheme. *Id.* at 1084.

Plaintiffs argue that continued use of the term "architectural consultant" in mailings and business cards was an ongoing fraud. We do not believe that this case presents an analogous scenario. Here, the alleged fraudulent scheme involved using architectural consultants to design and supervise remodelling projects while deceiving customers into believing they are licensed architects. The later alleged acts—new brochures mailed to other prospective customers—were not designed to obscure the original fraudulent scheme from the plaintiffs' eyes. Unlike the situation in *Hendrickson Bros.*, where later bid-rigging was necessary to hide the earlier fraudulent bid-rigging, later mailings to other people using the term "architectural consultants" would not tend to conceal from the plaintiffs the alleged fraudulent nature of the term. We are unconvinced that simply continuing to use the term "architectural consultants" is a self-concealing fraud that justifies tolling Connecticut's statute of limitations for fraud. We grant defendants' summary judgment motion against plaintiffs' fraud claim.

### C. RICO Claim on the Merits

"To have standing under RICO, plaintiffs must show that their injuries were proximately caused by defendants' RICO predicate acts." *Trautz v. Weisman*, 809 F.Supp. 239, 243 (S.D.N.Y.1992) (citing *Sedima*

*S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495, 105 ·S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985)); *see also Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990) (injury must be proximately caused by either the RICO pattern of racketeering or the predicate acts). In cases involving mail fraud, plaintiffs must also show reliance upon the misrepresentations and injuries caused by that reliance. *See Metromedia,* 983 F.2d at 368 (2d Cir.1992) (citing *County of. Suffolk v. LILCO,* 907 F.2d 1295, 1311 (2d Cir.1990)).

The RICO pattern or predicate acts are a proximate cause of plaintiffs' injuries if "they are a substantial factor in the sequence of responsible causation, and it the injury is reasonably foreseeable or. anticipated as a natural consequence." *Hecht,* 897 F.2d at 24. Factual causation is immaterial.

The link between the design defect in plaintiffs' roof and the alleged deception regarding the professional status of Zeug or Friedmutter is fairly attenuated. The alleged injuries—the monetary costs and design defects requiring repairs—most directly connected to the representations themselves made in RCI's brochures or by any of its sales representatives (otherwise called "architectural consultants") regarding their professional status.

The design error ·could have occurred whether or not defendants made false representations in mailings or interstate telephone calls regarding the professional qualifications of its staff. Whether Zeug and Friedmutter were held out to the public as salespersons, architects, or "architectural consultants" would play no proximate role in the injuries ultimately suffered by plaintiffs unless plaintiffs offer evidence that they would not have hired RCI but for their belief that licensed architects would design and supervise their remodelling.

Obviously, the most direct cause of the plaintiffs' injuries was the faulty design of the roof and possibly the shoddy workmanship of its construction, not any misrepresentations regarding "architectural consultants." However, if defendants intentionally mislead plaintiffs into believing that they would be dealing with an architect in the design and supervision of their · remodelling ·to induce them to hire RCI, knowing that an architect would not actually design and supervise the project, and the roof's design defect resulted from the failure to use an architect, plaintiffs' injuries might be proximately traceable to defendant's fraudulent misrepresentations. Under ·such circumstances, plaintiffs might be able to make out a RICO claim against any of the defendants who participated in at least two predicate acts.

Though we tend to doubt such considerations were on their mind at the time, plaintiffs do claim that their belief that licensed architects would design their addition partly motivated their decision to hire RCI. This factual issue, resting in large measure on the Moellers' credibility, must be resolved·by the jury.

The architect retained by plaintiffs in connection with their state court action gave his expert opinion that the design of the addition did not appear to be the work of an architect. Moreover, defendants have been unable to provide the identity of the architect who supposedly designed the addition. During discovery, defendants produced two internal documents which identified Eric Jacobson as the "Arch." on the Moeller project. *See* Moeller Aff., Exhibits H and I. However, the evidence submitted by defendants showing the employment contracts of RCI's architects does not include any such contract with Eric Jacobson. Taken together, this evidence could support an inference that the plans for the addition were not in fact designed by a licensed architect.

It is undisputed that RCI employed, at least at one time, a staff of licensed architects. Defendants claim that the design defect in the addition's roof was the fault of one of their staff architects. Factual questions exist as to whether the Moellers' project was designed by a licensed architect and, if not, whether defendants actions were designed to deceive plaintiffs into believing that Zeug and Friedmutter, described as "architectural consultants," were architects.

No architects were ever identified to plaintiffs as associated with the remodelling. As envisioned by the brochures, Zeug and Friedmutter were personally involved in dis-

cussing the plans and drawings for the addition. Zeug worked with plaintiffs to design the addition before the plans were drafted. Friedmutter was later involved in reviewing the "each and ever word on the drawings" and making "all the changes as indicated on the supplement." Friedmutter Dep. at 47–48.

Regarding the deceptive nature of the mailings, plaintiffs highlight representations made by RCI in its brochures proclaiming that its "Architectural Consultants have the skill to design a client's once-in-a-lifetime project." See Moeller Aff., Exhibit A. One of the brochures sent as part of RCI's mass mailing, under the heading "Estimate, Specifications & Plans," describes the duties of the architectural consultant to include development of a final set of plans and detailed specifications, and review of the plans and contract specifications. Beside this description is a sketch of a man seated at a drafting table drawing. A later section entitled "Architectural Working Drawings" reads:

> Our Consultant with one of our Staff Architects will visit your home to measure the job for all existing conditions and then proceed to prepare a complete set of working drawings showing even the smallest details.

Moeller Aff., Exhibit B. Grammatically, the above quoted paragraph says that the consultant visits a project site with a staff architect, but it leaves unclear who drafts the working drawings. Since the consultant is the subject of the sentence, the implication is that the verb "prepare" applies to the consultant.

We do not agree that use of the term "architectural consultant" by RCI was fraudulent on its face as a matter of law, though we do find the brochures ambiguous concerning the function and duties of the consultants and the architects. By designating a salesperson as an architectural consultant, a reasonable person might infer that he would provide advice and services relating to the architecture of a project. If in fact such an individual performed duties one might expect of an architect, such conduct, when considered in combination with verbal representations and the title, could mislead a reasonable person in thinking that the consultant performed work as an architect. We also note that defendant Zaccaria admitted in his response to Plaintiffs' Rule 3(g) Statement that RCI referred to its architects as "licensed architectural consultants."

We do note that evidence exists in the record to support an inference that plaintiffs should have been aware that Zeug and Friedmutter were not licensed architects and that their title of "architectural consultant" meant they were RCI's sales representatives. As we mentioned, the brochure discusses the consultant and the architect as two separate people. The two applications for building permits submitted to the Town of Greenwich, signed by Inge Moeller on October 9, 1985 and November 7, 1988 respectively, while identifying the persons supervising compliance with the drawings and ordinances, listed no information beside the line that read, "If architect or professional engineer give Connecticut Registration Number." This not only could have placed the plaintiffs on notice that the listed supervisor was not an architect but also that architects are persons registered with the state. Also, the working architectural drawings dated October 2, 1985 that were signed by plaintiffs named the project's draftsman and consultant but no name was listed in the space beside the word "Architect."

Yet, as we have noted, two internal RCI documents identify Eric Jacobsen as the architect for the Moeller project. The conflicting statements regarding the identity of an architect for the Moellers' addition would seem to be a significant, and one that might lead a reasonable person concerned with the professional status of the project personnel, as plaintiffs claim they were, to make further inquiries.

■ The fact that there might be sufficient evidence to might support plaintiffs' RICO claim does not end our inquiry. Plaintiffs have not offered any evidence connecting defendants Friedmutter, Mingione, and Branca with two predicate acts as is required to make out a RICO claim against each of them. Since the focus of § 1962(c) is on the individual pattern of racketeering engaged in by a defendant rather than the collective activities of an enterprise, *United States v.*

*Persico,* 832 F.2d 705, 714 (2d Cir.1987), a RICO claim under § 1962(c) must allege that each defendant committed two or more predicate acts. *See Morin v. Trupin,* 747 F.Supp. 1051, 1064 (S.D.N.Y.1990).

When the predicate acts pled concern fraud, the concerns associated with pleading fraud with particularity take on even greater importance. *Plount v. American Home Assur. Co.,* 668 F.Supp. 204, 206 (S.D.N.Y.1987). The pleading requirements of Fed.R.Civ.P. 9(b) apply to allegations of mail and wire fraud as predicate RICO civil offenses. *Morin,* 747 F.Supp. at 1065.

In the case of defendant Friedmutter, regardless of the nature of the term "architectural consultant," the motion papers do not establish that he performed any services that could have led plaintiffs to believe that an architect designed their addition. Plaintiffs allege that Friedmutter was a shareholder and member of RCI's board of directors. But the record contains no evidence that Friedmutter had any responsibilities or connection to the drafting of plans, marketing, or mailing of RCI's brochures. Indeed, in their Rule 3(g) Statement, plaintiffs states that it was Zeug who helped develop the designs for their project and that his signature was on the plans. Pl.'s 3(g) Statement at ¶ 23 and 26.

The most plaintiffs have said is that Friedmutter, whose business card identified him as an architectural consultant, explained the final set of drawings and plans to them. This, however, does not connect him with any of the alleged acts of mail or wire fraud, nor does it proximately connect him to the design defect in the roof. Further, at his deposition, Friedmutter specifically stated that defendant Zaccaria was responsible for producing and disseminating RCI's promotional literature. Friedmutter Dep. at 17. Moreover, he stated that his only involvement in the Moeller project after the plans were signed involved adding some cabinets above a refrigerator. *Id.* at 41. None of this amounts to two predicate acts by Friedmutter. His involvement in plaintiffs' project occurred only after the plans were drawn up. Nothing links him to the design defect that forms plaintiffs' RICO injury. Therefore,

plaintiffs' RICO claims against Friedmutter must therefore be dismissed since no evidence exists tying him to two predicate acts of mail or wire fraud.

Where moving party has made a properly supported motion, non-moving party must come forward with specific facts to show is genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *L & L Started Pullets, Inc. v. Gourdine,* 762 F.2d 1, 3 (2d Cir.1985). The non-moving party may not rest on allegations or denials in its pleading. Fed.R.Civ.P. 56(e) but must produce sufficient evidence to reasonably support a jury verdict. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Plaintiffs have also offered no evidence to support a finding that defendants Mingione or Branca were associated with two predicate acts. At oral argument, defendants identified Mingione as the field supervisor on the Moeller project and Branca as the head of RCI's production department who visited the project after work stopped. In his deposition, Hans Moeller said that he discussed the lack of supervision at the job site and concerns about the project's progress with Branca on numerous occasions. Plaintiffs also point out that the "House and Home" article described Mingione as a Construction Superintendent. In their Rule 3(g) Statement, plaintiffs allege that Mingione and Branca are RCI shareholders and members of its board of directors.

Whatever their titles or financial interests in RCI, plaintiffs have not offered any specific allegations connecting Mingione or Branca to any predicate acts of mail or wire fraud. Conversations with Branca about problems at the job site do not amount to mail or wire fraud. Nothing suggests they had any role in RCI's marketing or mailings.

The few particular facts plaintiffs have offered concerning Mingione and Branca do not proximately connect them to the design defect injury to their property, nor do they establish their involvement in two predicate acts. Plaintiffs' claim that defendants, in-

cluding Mingione and Branca, as officers, directors and shareholders of RCI, made representations regarding the professional qualifications of the architectural consultants. In particular, Inge Moeller at her deposition stated that at RCI's offices Mingione represented, in the presence of Branca, that licensed architects would design and supervise the project. Inge Moeller Dep. at 123. Hans Moeller also stated that Mingione would get involved in the project when plaintiffs asked for supervision. Hans Moeller Dep. at 143.

Such allegations do not support connect Mingione or Branca to two predicate acts of mail or wire fraud or proximately connect their actions to the RICO injury suffered by plaintiffs to their property. For this reason, we grant their motions for summary judgment on the RICO claim.

■ The record differs somewhat with respect to Zaccaria. There is evidence linking defendant Zaccaria to the allegedly fraudulent mailings. Plaintiffs allege receiving through the mail several RCI brochures. As we noted, Friedmutter stated that Zaccaria was responsible for RCI's marketing and promotions. Since the brochures, particularly when considered in the context of the conduct of RCI's salespeople, were arguably fraudulent, one could draw an inference that Zaccaria was directly connected to at least two predicate acts of mail and wire fraud that proximately led to the design flaw that caused plaintiffs injury to their property. Plaintiffs allege that each mailing was in furtherance of the defendants' scheme to fraudulently persuade people in believing they were receiving the services of architects.

We note that the separate mailings in this case were directed toward a single fraud. This raises the issue of whether these mailings constitute two or more predicate acts of mail fraud, or whether they would represent only a single predicate act of mail fraud. This issue has not been briefed by the parties, and we do not decide it at this point.

■ The elements of mail fraud are: (1) the existence of a scheme to defraud and (2) use of interstate mails or transmission facilities in furtherance of the fraud. *United States v. Corey*, 566 F.2d 429, 430 n. 2 (2d. Cir.1977). In criminal RICO cases, "[e]ach mailing in furtherance of a scheme to defraud is a separate mail fraud offense." *United States v. Weinberg*, 656 F.Supp. 1020, 1026 n. 5 (E.D.N.Y.1987) (citing *United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970) ("each mailing pursuant to an alleged scheme to defraud constitutes a separate offense."). The Second Circuit has held in *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989), that "the substantive standards as to what must be proven in a criminal RICO prosecution also govern civil RICO actions." *Id.* at 1391. Additionally, the court in *North Star Contracting v. Long Island Rail Road*, 723 F.Supp. 902, 906 (E.D.N.Y.1989), held that individual mailings furthering one scheme to defraud constitute separate predicate acts of mail fraud applies to civil RICO actions. As we said, we do not decide this issue without the benefit of additional briefing by the parties.

In sum, the facts are somewhat convoluted; the representations made, in the context of the services being performed, might have been misleading. Reading the record in a light most favorable to the plaintiffs on defendant Zaccaria's motion for summary judgment, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989), reasonable inferences regarding Zaccaria's connection with the arguably fraudulent mailings and his intent to defraud could be drawn in favor of the plaintiffs. Since summary judgment is ordinarily inappropriate where a defendant's intent is implicated, *Donahue v. Windsor Locks Bd. of Fire Comrs.*, 834 F.2d 54, 59 (2d Cir.1987), we leave these issues to the jury. Zaccaria's motion for summary judgment on the RICO claim is denied.

## III. CONCLUSION

To conclude, we grant defendants' motions for summary judgment on plaintiffs' state law fraud claims in their entirety. On their RICO claims, we grant the summary judgment motions of defendants Branca, Friedmutter, Mingione. We deny plaintiffs' mo-

tion for summary judgment and defendant Zaccaria's motion on the RICO claim.

SO ORDERED.