CITADEL MANAGEMENT INC.,
a Bahamian Corporation,
Plaintiff,

v.

TELESIS TRUST, INC., a Delaware corporation, Brite Business S.A., a British Virgin Island corporation, Mensana Corporation, a Bahamian corporation, Charles W. Sullivan, Marjorie Hertzog, a/k/a Marjorie S. Tyson, a/k/a Marjorie Suzan Tyson, and Johan Hertzog, a/k/a Johan Christiaan Hertzog, a/k/a Johan Tysonhertzog, Defendants.

No. 00 Civ. 2342(RWS).

United States District Court,
S.D. New York.

Nov. 20, 2000.

As Amended Nov. 28, 2000.

138

Mintmire & Associates, Palm Beach, FL, Mercedes Travis, of counsel, for plaintiff.

Herrick, Feinstein, New York City, James A. Moss, Darlene Fairman, Richard Y. Im, of counsel, for Defendants Charles W. Sullivan and Mensana Corporation.

Morris K. Mitrani, New York City, for Remaining Defendants.

## OPINION

SWEET, District Judge.

Defendants Charles W. Sullivan ("Sullivan") and Mensana Corporation ("Mensana") have moved to dismiss the Amended Complaint in its entirety pursuant to Rules 9(b), 12(b)(2), (4) and (6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted, failing to plead fraud with particularity, lack of jurisdiction and insufficiency of service of process. Plaintiff Citadel Management, Inc. ("Citadel") has cross-moved for leave to refile. Also before the Court are Citadel's motions pursuant to Rule 55, Fed.R.Civ.P., for default against defendants Marjorie Hertzog, a/k/a Marjorie S. Tyson, a/k/a Marjorie Susan Tyson ("Tyson") and Telesis Trust, Inc. ("Telesis"). For the reasons discussed below, the default motion is denied in part and granted in part, the motion to dismiss is granted, and plaintiff is granted leave to refile in accordance with this opinion.

### The Parties

Citadel is incorporated under the laws of the Bahamas.

Defendant Telesis is a Delaware corporation. At all times relevant to the complaint, defendant Johan Hertzog, a/k/a Johan Christiaan Hertzog, a/k/a Johan Tyson Hertzog ("Hertzog") was the President and CEO of Telesis.

Defendant Brite Business, S.A. ("Brite") is a business incorporated under the laws of the British Virgin Islands of which Hertzog is an officer.

Defendant Mensana is a business incorporated under the laws of Delaware.

Defendant Sullivan is a New York resident.

Defendant Marjorie Hertzog, a/k/a Marjorie S. Tyson, a/k/a Marjorie Susan Tyson ("Tyson") is a resident of California.

Defendant Hertzog is a resident of California.

### Background and Prior Proceedings

This action essentially seeks the return of funds that were the subject of judgments entered against defendants Hertzog and Telesis, among others not named here (the "English defendants"), by the High Court of Justice for England and Wales in 1998. The judgments arose out of the English defendants' failure to honor an $11 million investment contract between Citadel and Equal Limited ("Equal"), a British corporation of which Hertzog was a director. Rather than investing Citadel's funds as per the contract, Equal and others disbursed the funds almost immediately after the contract was signed on April 14, 1998. The disbursals included a $5 million transfer by Hertzog to defendant Mensana, who then transferred the funds through a bank in Lebanon to a third party; an approximately $5,250,000 transfer to accounts at Chase Manhattan Bank in New York held by Telesis and Hertzog;

and additional miscellaneous payments for the benefit of the defendants in this action.

The English Court issued two "Mareva Injunctions," requiring the English defendants, which included Hertzog, to disclose the whereabouts of the funds and restraining them from disposing of any assets they held worldwide until trial. No disclosures were made, but, based upon discovery provided regarding the transfer to Chase Manhattan Bank, the court allowed Citadel to add Telesis as a defendant. When no defense was timely served, the English court awarded Citadel a judgment against Hertzog for $40,100,000.00 plus 8% interest from August 5, 1998, and on October 14, 1998 issued a judgment against Telesis in the amount of $5 million plus damages and interest.

On May 24, 1999, Citadel sought to enforce the English judgments against Hertzog and Telesis in the Supreme Court of New York, Queens County. At the same time, Citadel sought orders of attachment and was granted a temporary order restraining both defendants and Chase Manhattan Bank from disposing of any assets held in New York. The New York Supreme Court granted Citadel's motion for summary judgment against Hertzog and issued an order of attachment to enforce the English judgment for $40,100,000 plus 8% interest. In the same decision, summary judgment was granted against Citadel and for Telesis, on the grounds that the English court had never obtained personal jurisdiction over Telesis under any grounds recognized in the relevant New York statute, C.P.L.R. § 5305(a).

Hertzog moved the English Court to set aside the judgment on December 16, 1999. Four days later, Citadel moved the English Court to hold Hertzog in contempt and send him to prison for violating that court's previously issued injunctions.

The New York Supreme Court notified the parties on January 4, 2000 that it would settle the order of attachment as set forth in its summary judgment decision but would stay enforcement pending the resolution of the set-aside and contempt motions in the English Court.

Proceedings in the English Court were adjourned to April 3, 2000, and Citadel agreed not to pursue enforcement of any claims against Hertzog until the English Court resolved the pending case.

Citadel filed the instant complaint on March 28, 2000, and later amended it (the "Amended Complaint") to claim the following: fraud against Telesis and Hertzog (1) arising out of allegedly false statements made by Hertzog regarding why the Telesis Chase Bank accounts were frozen; and (2) arising out of the written statement Hertzog provided on June 26, 1998 and later forwarded by his attorney to the English Court, to the effect that "I have not traded any of the Plaintiff's investment or funds ...."; (3) conversion against Telesis and Hertzog for transferring the funds without Citadel's authority; (4) against Tyson as a later beneficiary of the converted funds; (5) against Mensana and Sullivan as the beneficiaries of $4 million Hertzog improperly appropriated from Citadel and later wired to a bank in Lebanon; (6) against Brite "in the event that any of Citadel's funds were transferred to Brite;" (7) civil theft under Florida law against Hertzog for $250,000; (8) against Tyson for over $260,000; (9) against Telesis for over $5 million; (10) against Brite for $400,000; and treble damages for state and federal RICO violations against Telesis, Hertzog, Mensana, Sullivan, Brite and Tyson in Counts 11–18.

Meanwhile, the English Court held Hertzog in contempt of court on April 5, 2000 for disposing of his assets in violation of the Mareva Injunctions and denied his motion to set aside the default judgment. On June 7, 2000, the English Court granted Citadel leave to commence new proceedings against Hertzog based upon information received in the English proceedings. Citadel amended the complaint in this action to add Hertzog as a defendant on June 13, 2000.

Citadel initially filed default motions pursuant to Rule 55(c), Fed.R.Civ.P., on July 12, 2000. Due to technical errors in filing, Citadel filed an amended default motion against both Telesis and Tyson on July 17, 2000. On August 24, 2000, Citadel filed yet another motion for a default judgment against Tyson, seeking expenses related to filing and service. Tyson filed an affidavit in opposition to the default motion on September 1, 2000. Citadel filed a reply declaration on September 6, 2000, the date oral argument was heard. Tyson filed a second affidavit on September 15, 2000, whereupon the motion was deemed fully submitted. Telesis filed no opposition.

On July 13, 2000, defendants Sullivan and Mensana moved to dismiss the claims against them for failure to state a claim upon which relief may be granted, failing to plead fraud with particularity, lack of jurisdiction and insufficiency of service of process, pursuant to Rules 9(b), 12(b)(2), (4) and (6), Fed.R.Civ.P. Citadel responded and filed a cross-motion for leave to amend the complaint on August 7, 2000. Reply memoranda from each side were received through August 29, 2000, and the motion was deemed fully submitted after oral argument on September 6, 2000.

## Discussion

### I. Default

#### A. Legal Standard

Citadel moves for default judgments against Tyson and Telesis pursuant to Rule 55 on the grounds that these defendants failed to plead or otherwise defend within the time allotted by the Federal Rules of Procedure.

■ Where entry of a default judgment is opposed, the standard for granting such a judgment under Rule 55 is governed by the same principles that apply to a motion to set aside entry of a default. *See Commercial Bank of Kuwait v. Rafi-*

*dain Bank*, 15 F.3d 238, 243 (2d Cir.1994); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir.1981). The standard for setting aside entry of a default is whether there is "good cause," *see* Rule 55(c), which requires consideration of "whether [defendant's] default was willful, whether setting the default aside would prejudice [plaintiff] and whether [defendant] presented a meritorious defense." *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986). In assessing whether good cause exists, the Court must consider "whether the default was willful, whether setting it aside [or declining to enter it] would prejudice the adversary, and whether a meritorious defense is presented." *Rafidain*, 15 F.3d at 243 (*quoting Meehan*, 652 F.2d at 276). This test should be applied in the context of the general preference "that litigation disputes be resolved on the merits, not on default." *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir.1995). Doubts should be resolved in the non-movant's favor to increase the likelihood that the case may be resolved on the merits. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95–96 (2d Cir.1993).

### B. Tyson

■ Citadel alleges that Tyson has defaulted because she was timely served with the original complaint, RICO statement and summons June 5, 2000 at her Florida address, and that she failed to file an answer by June 25, 2000, within 20 days as required by Rule 12(a)(1)(A). Tyson disputes that she was ever served.

Citadel filed the Amended Complaint on June 14, 2000, before Tyson's time to respond had run, which started the default clock anew. Citadel alleges that Tyson was timely served with the Amended Complaint on June 19, 2000 at her California address, and she failed to file an answer by June 29, 2000.[1] The process server's affidavit alleges that Tyson was served in

---

1. Rule 15(a) grants parties 10 days in which to respond to an amended pleading after the amended pleading is served. Tyson did not

make any appearance until her affidavit was filed on September 19, 2000.

person in Los Angeles at 6:45 pm on June 5, 2000, and describes the person he served as a 5′7″ tall, thin, white woman with blond hair who was 38 years old. Travis Reply Dec. Ex. A. Citadel provides copies of billing statements from the process server, who it claims "staked out" Tyson and, after eight hours, followed her from the parking lot into her gated apartment building and served her outside her apartment door. Unrecognizable copies of photographs of a person behind a gate have been submitted in support of this allegation. If Tyson was in fact served in this manner, service was proper. *See* Fed. R.Civ.P. 4(e)(1) (service is proper if made in accordance with the law of the state in which service is effected); Cal. Stat. § 415.10 (personal delivery of summons and complaint).

In addition, Citadel claims that Tyson was served with papers a second time, the next day, at her home in Miami, Florida. A return of service affidavit indicates that the server personally served a woman "who would not identify herself but who was 5′8″, 125–135 pounds, 25–35 years of age, long blonde hair for whom [the server] previously had seen a copy of her California drivers license and who matched the picture." Travis Reply Dec. Ex. C. If Tyson was the person served, service was proper. *See* Fed.R.Civ.P. 4(e)(1); Fla. Stat. § 48.301(1)(a) (personal service of summons and complaint).

Counsel for Citadel states that she attempted to effect service on Tyson a third time at both the Florida and California addresses by sending the documents by Federal Express priority overnight delivery, which, after numerous delivery attempts, were refused and returned.

Tyson contends that she was never served with papers. Although she admits that she resides at the California address at which the second process server states he served her on June 5, 2000, she insists that she never received service of process. She denies ever opening the gate to the Los Angeles apartment building to let in the process server or being served there. Moreover, Tyson states that she does not live or work in Florida, was not there on June 6, 2000, and has not visited the state for many months. Nonetheless, Tyson requests leave to file an answer to the complaint, and attached her proposed answer as an exhibit to her second affidavit in opposition to default.

Although Citadel blames Tyson for committing "deliberate evasions" in an attempt to avoid becoming involved in the lawsuit, the fact that Tyson has submitted a proposed answer to the complaint suggests that, in fact, she does wish to contest this suit. Applying the good cause standard generously in order to see this litigation resolved on the merits, *see Enron Oil,* 10 F.3d at 96, I find that Tyson is not in default. Citadel's motion for a default judgment and expenses against Tyson is denied, and Exhibit A to Tyson's second affidavit in opposition to default is deemed to be her answer. Tyson shall be served and shall file an original answer forthwith.

### C. *Telesis*

With regard to Telesis, Citadel alleges that it served Telesis with the Complaint, summons and RICO statement on May 26, 2000, and that Telesis is in default for failing to serve a response by June 15, 2000. However, the Amended Complaint was filed on June 14, 2000, before Telesis's time to respond had finished, and started the clock anew. Citadel argues that Telesis is nonetheless in default because it failed to file a response to the Amended Complaint within the appropriate period after it was served on May 26, 2000. However, by memo-endorsement of July 27, 2000, I enlarged the time for answering and ordered that the answer was due on August 15, 2000. Nonetheless, Telesis did not file its answer until August 29, 2000. As stated above, Telesis has filed no opposition to the entry of default judgment against it.

Therefore, because its answer was not timely filed, and because it has filed no opposition to the instant motion, good

cause has not been shown, and Telesis is in default.

## II. Motion to Dismiss

Also pending is the motion by Mensana and Sullivan to dismiss the Amended Complaint in its entirety pursuant to Rules 9(b), 12(b)(2), (4) and (6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted, failing to plead fraud with particularity, lack of jurisdiction and insufficiency of service of process.

### A. Proper Party

■ Mensana first notes that the complaint incorrectly names it as a Bahamian Corporation, whereas in fact, Mensana is a Delaware Corporation. Mensana Corporation Limited ("Mensana Ltd.") is a Bahamian corporation, whereas Mensana (Delaware) was the entity that conducted the wire transfer to Lebanon that is the issue of this complaint. Sullivan, the president and sole shareholder of Mensana, as well as an officer and director of Mensana Ltd., has submitted a sworn affidavit attesting to these facts. Citadel acknowledges its mistake in naming Mensana as a Bahamian rather than a Delaware corporation. Leave is granted to amend the complaint to remedy this error.[2]

### B. Personal Jurisdiction

■ Personal jurisdiction exists where the defendant is both subject to service of process and has minimum contacts such that the exercise of jurisdiction comports with due process. See Kernan v. Kurz–Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999).

■ Under New York's long-arm statute, jurisdiction is properly exercised over any non-domiciliary who, either in person or through an agent, "transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). Non-domiciliaries are subject

to the jurisdiction of New York courts when the claim arises out of the non-domiciliary's purposeful activity here. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir.1999); Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988).

### 1. Service of Process

■ Mensana and Sullivan allege that despite the fact that they are in actual receipt of service, they should be dismissed from the action because it was never properly served pursuant to Rule 4. Sullivan's affidavit states that the summons and complaint were served upon Mensana and Sullivan by leaving them with an employee of Sullivan's New York apartment building (the doorman), who delivered them to Sullivan's housekeeper, who in turn delivered them to Sullivan. Sullivan Aff. at ¶ 7.

As discussed above, Rule 4(e) provides that federal service of process is proper if conducted in compliance with either the law of the forum state or the state in which service is effected, in this case New York. Under New York law, personal service may be effected on an individual:

1. By delivering the summons within the state to the person to be served; or

2. By delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served *and* by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business .... within twenty days .... or

---

**2.** Because Citadel is a Bahamian corporation, Mensana Corp. is a Delaware Corporation, and Citadel is diverse from all defendants, there is complete diversity in this action pursuant to 28 U.S.C. § 1332(a), and therefore this Court retains subject matter jurisdiction notwithstanding the dismissal of the federal claims, *infra*.

3. By delivering the summons within the state to the agent for service of the person to be served as designated under rule 318. . . .

N.Y. C.P.L.R. § 308 (McKinney's 2000) (emphasis added). An "actual place of business" includes "any location that the defendant, through regular solicitation or advertisement, has held out as its place of business." N.Y. C.P.L.R. § 308(6) (McKinney's 2000). In order to qualify as a designated agent of a person, a writing must be filed with the clerk of the county in which the person to be served resides so designating the agent. N.Y. C.P.L.R. § 318 (McKinney's 2000).

First, the affidavit of substituted service reflects that the summons and complaint were served upon Sullivan on June 7, 2000, through his doorman at 240 East 47th Street in New York City. The doorman was of suitable age and would not allow the process server to proceed to Sullivan's apartment. However, he did confirm Sullivan's residence there and state that he was authorized to accept service on Sullivan's behalf. In addition to leaving the summons with the doorman, Citadel had also mailed copies of the summons to Sullivan within 20 days. The affidavit of substituted service reflects that the process server mailed the summons to "Charles W. Sullivan c/o Mensana Corp." at the same address, one day after the summons had been left with the doorman. Travis Decl. Ex. T. Delivery and mail service was proper as to Sullivan pursuant to C.P.L.R. § 308(2). *See FDIC v. Scotto*, No. 97 – CV–1631,1998 WL 357324,*2 (N.D.N.Y. June 29, 1998) (upholding service on caretaker pursuant to § 308(2)); *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033, 1051 (S.D.N.Y.1993) (doorman); *Braun v. St. Vincent's Hospital & Medical Center*, 57 N.Y.2d 909, 456 N.Y.S.2d 763, 442 N.E.2d 1274 (N.Y.1982) (same); *F.I. duPont, Glore Forgan & Co. v. Chen*, 41 N.Y.2d 794, 396 N.Y.S.2d 343, 364 N.E.2d 1115 (1977).

These same acts were intended to constitute service of Mensana, which alleges that leaving process with a doorman rather than with a registered agent is insufficient. Personal service upon a domestic or foreign corporation is governed by Rule 4(h), which authorizes service pursuant to the law of the state in which service is made. Fed.R.Civ.P. 4(h)(1). New York C.P.L.R. § 311 allows service either to "an officer, director, managing or general agent . . . or to any other agent authorized by appointment or by law to receive service." N.Y. C.P.L.R. § 311(a)(1) (McKinney's 2000). Service upon a corporation should be by hand delivery, *see Jubilee, Inc. v. Haslacha, Inc.*, 270 A.D.2d 34, 704 N.Y.S.2d 226, 226 (N.Y.App.Div.2000), and is not proper where process is served upon the doorman or concierge of the corporation's building and then mailed to the defendant corporation's address. *See Napic, N.V. v. Fverfa Investments, Inc.*, 193 A.D.2d 549, 597 N.Y.S.2d 707 (N.Y.App.Div.1993). Thus although the defendant does not contest that 240 East 47th Street is Mensana's address, and that Sullivan is an officer of Mensana, substituted service to Sullivan's doorman did not comply with the technical requirements of C.P.L.R. § 311.

The Supreme Court recognizes that "the core function of service is to supply notice of the pendency of a legal action, in a matter and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996). Thus, when a process server serves someone who does not have "express authorization to accept service" for a corporation, service is nonetheless proper under C.P.L.R. § 311 if it is "made in a manner which, objectively viewed, is calculated to give the corporation fair notice" of the suit. *Kuhlik v. Atlantic Corp. Inc.*, 112 F.R.D. 146, 148 (S.D.N.Y.1986). A corporation has been given "fair notice" of a suit when the pro-

cess server has diligently attempted to comply with § 311. *See Fashion Page Ltd. v. Zurich Insurance Co.*, 50 N.Y.2d 265, 272, 428 N.Y.S.2d 890, 406 N.E.2d 747 (N.Y.1980).

Here, the process server attempted to serve Mensana at the address listed in the current telephone book, but saw no indication that Mensana had an office there. Next, the server attempted to serve Mensana at the offices of Most & Horowitz at 1133 Sixth Avenue, Suite 3380 which was listed on Mensana 1998 bank statements, but Most & Horowitz no longer had offices at that location. Finally, after making several trips to 240 East 47th Street, where Sullivan lived and the server reasonably believed Mensana to be located, the process server left the summons and complaint with the doorman, who represented that he was authorized to accept service. Mensana was on notice as of the date that Sullivan, its officer, received process. Moreover, Sullivan and Mensana share the same attorney, which also put Mensana on notice that Citadel was attempting to include Mensana as a defendant. *Cf. Gleason v. McBride*, 869 F.2d 688, 693 (2d Cir.1989) (in Rule 15 context, where two defendants share attorney and attorney has reason to believe second defendant will be added, second defendant is presumed to be on notice). Thus, Mensana will suffer no prejudice if Citadel is granted leave to re-serve.

### 2. *Due Process*

▇▇▇▇ Even if the exercise of jurisdiction is permissible pursuant to CPLR § 302, "the court then must decide whether such exercise comports with the requisites of due process." *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir.2000) (*quoting Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)). Due process requires that the defendant has minimum contacts with the forum state. *See International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

As Sullivan is a resident of New York, the exercise of personal jurisdiction over him is proper.

▇▇▇ With regard to Mensana, Citadel's allegation that Mensana operates an office in New York is uncontested. Mensana has presented evidence that Mensana Ltd. is a Bahamian corporation, and that Mensana is incorporated in Delaware, but denies only that Mensana Ltd.—not Mensana— has contacts with New York. Mens. Br. at 24. Combined with the fact that its president and sole shareholder resides in New York, this unrebutted allegation makes out a *prima facie* case that Mensana has minimum contacts with New York such that the exercise of personal jurisdiction over it does not offend due process. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir.1997) (finding plaintiff's allegations had established minimum contacts because they were "uncontested in material part"); *Clay Paky, S.p.A. v. Vari–Lite, Inc.*, No. 99 Civ. 11401(BSJ), 2000 WL 977709,*6 (S.D.N.Y. July 14, 2000) ("By maintaining an office in New York, [the defendant] 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.' ") (*citing Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

There is personal jurisdiction over both Mensana and Sullivan.

### C. *Failure to State a Claim*

The essence of Sullivan and Mensana's 12(b)(6) motion is that Citadel's Amended Complaint is more properly construed as one for breach of contract against Equal, an unnamed third entity, rather than one for conversion, or RICO violations.

▇▇▇ Although the other defendants have not explicitly moved to dismiss the complaint for failure to state a claim, the Court has discretion to dismiss claims *sua sponte* pursuant to Rule 12(b)(6), particularly where it is clear that a plaintiff could not have prevailed on the facts as alleged in the complaint. *See Fitzgerald v. Feinberg*, Nos. 98 Civ. 8885, 82714(RWS), 1999

WL 619584,*5–6 (S.D.N.Y. Aug. 16, 1999). *Sua sponte* dismissal for failure to state a claim is appropriate where the plaintiff is given notice and an opportunity to be heard. *See Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir.1994). Where, as here, two defendants have moved to dismiss the Amended Complaint in its entirety for failure to state a claim, and the plaintiff has responded in full, the plaintiff is on notice and the 12(b)(6) motion may be considered with regard to all defendants for all claims briefed.

■■■■■ Courts considering a 12(b)(6) motion must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). On a motion to dismiss, courts may consider the complaint and documents attached to or incorporated by reference to it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (internal citations omitted). Neither materials that are unattached or unincorporated to the complaint nor unsupported factual allegations in legal memoranda, will be considered. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989); *Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988).[3]

■■■■ Dismissal is "appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.1999) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### 1. Conversion (Counts 3–6)

#### a. Elements

■■■■ Conversion is the "exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession." *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir.1997) (citation omitted); *see Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995). The plaintiff asserting a conversion claim must allege that it had "ownership, possession or control of the money before its conversion," *ESI, Inc. v. Coastal Power Production Company*, 995 F.Supp. 419, 433 (S.D.N.Y.1998) (*citing Aramony v. United Way*, 949 F.Supp. 1080, 1086 (S.D.N.Y.1996)).

■■■■ While New York recognizes that money is the sort of property that may be the subject of a conversion action, the money must be held in a "specific, identifiable fund and [subject to] an obligation to return or otherwise treat in a particular manner the specific fund in question." *High View Fund, L.P. v. Hall*,

---

**3.** Plaintiff has submitted hundreds of pages of documents in response to the motion to dismiss, including the Undertaking, the Assignment, the requirements of the Mareva Injunctions, and evidence of a preexisting contract between Mensana and Equal relative to the investment of funds with IIC. However, because Citadel did not attach, incorporate by reference, or rely upon these documents in its Amended Complaint, the proffered documents will not be considered. *See also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989) (even "limited quotation does not constitute incorporation by reference") (*citing Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir.1985)); *Dietrich v. Bauer*, 76 F.Supp.2d 312, 328 (S.D.N.Y.1999) ("Matters suggested in [the plaintiff's] opposing papers that interpret allegations in the Amended Complaint broadly or

facts that are offered but that do not appear in the Amended Complaint will not be considered."); *Sheppard v. TCW/DW Term Trust 2000*, 938 F.Supp. 171, 178 (S.D.N.Y.1996) (same); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y. 1989) (stating that "it is axiomatic that the complaint cannot be amended by the briefs in opposition to a motion to dismiss"). Citadel "should not so easily be allowed to escape the consequences of its own failure." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991).

On the other hand, the contract submitted by the defendants in support of the motion to dismiss may be considered, as Citadel had notice of the document's existence and in fact relied on it in the Amended Complaint. *See Cortec*, 949 F.2d at 47.

27 F.Supp.2d 420, 429 (S.D.N.Y.1998); *see Benjamin v. Kim*, No. 95 Civ. 9597, 1999 WL 249706, at *16 (S.D.N.Y. Apr. 28, 1999) ("if the allegedly converted money is incapable of being described or identified ... as a specific chattel, it is not the proper subject of a conversion action.") (internal citations and quotations omitted); *Ehrlich v. Howe*, 848 F.Supp. 482, 492 (S.D.N.Y. 1994); *Key Bank v. Grossi*, 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (N.Y.App.Div. 1996); *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 883–884, 452 N.Y.S.2d 599 (N.Y.App.Div.1982). This is so because a depositor loses (and the bank gains) title to money deposited in a general account at the moment those funds are deposited. *Peoples Westchester Savings Bank v. FDIC*, 961 F.2d 327, 330, 332 (2d Cir.1992); *Swan Brewery Co. Ltd. v. United States Trust Co.*, 832 F.Supp. 714, 718 (S.D.N.Y.1993).[4]

Where, as here, a plaintiff alleges the reconversion of funds by third parties, the complaint must allege that the recipient had reason to know the funds had been unlawfully converted. *See* Laura B. Bartell, "The Lease of Money in Bankruptcy: Time for Consistency?" 16 Bankr.Dev. J. 267, 294–95 (2000) ("[I]f the subject of the conversion is money or negotiable instruments, a bona fide purchaser or holder in due course cannot be held liable."); *Federal Ins. Co. v. Banco de Ponce*, 751 F.2d 38, 41 (1st Cir.1984); *Hinkle v. Cornwell Quality Tool Co.*, 40 Ohio App.3d 162, 532 N.E.2d 772, 777 (1987).

■■■ In addition, an action for conversion cannot lie where damages are merely sought for breach of contract. *See In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir.1993) (holding that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain); *Fraser v. Doubleday & Company, Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y.1984); *Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 863, 521 N.Y.S.2d 917, 918 (1987). For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some "wrong" that is separately actionable. *See Elma RT v. Landesmann Int'l Marketing Corp.*, No. 98 Civ. 3662(LMM), 2000 WL 297197 *3 (S.D.N.Y. March 22, 2000); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (holding that a defendant may be liable in tort where it breaches a duty of reasonable care distinct from its contractual obligations, and where it engages in tortious conduct separate and apart from its failure to fulfill its contractual obligations).

■■■ In sum, in order to state a claim for conversion under the circumstances presented by this case, the plaintiff must allege that (1) some actionable wrong other than breach of contract caused plaintiff's injury; (2) it had ownership of the funds at the time they were first converted; (3) the defendants exercised unauthorized dominion over the funds; (4) the funds were specific and identifiable; (5) the funds were to have been treated in a particular manner but were not so treated; and (6) the third party defendants had no

---

4. Citadel argues that if the defendants' theory of the case were true, "every entrustment of funds to a stock brokerage house into a discretionary account would mean legal title past [sic] to the broker." (Cit. Resp. Br. at 13.) Yet this purportedly absurd result is in fact an accurate statement of the law, at least in part. As a matter of state law, "when a customer of a bank deposits funds into an account at the bank, the ... funds themselves no longer belong to the depositor, but become property of the bank and available to the bank for use in its business." Laura B. Bartell,

"The Lease of Money in Bankruptcy: Time for Consistency?" 16 Bankr.Dev. J. 267, 287–88 (2000). This rule also applies to funds invested with brokerages, unless the funds are held in a distinct separate account in which they are specifically identifiable. *See infra; The High View Fund, L.P v. Hall*, 27 F.Supp.2d 420, 429 (S.D.N.Y.1998) (finding no conversion of $1 million investment in corporation to manage golf properties misappropriated by defendant from corporate accounts).

notice that the funds had been unlawfully transferred.

### b. *Analysis*

The Agreement between Equal and Citadel (the "Agreement") provided that Citadel would "commit and transfer ... $11 million USD ... for the benefit of its client Equal Limited ..., free and clear of all liens, interests, charges and encumbrances." Motion to Dismiss Ex. 6 ¶ 1. Equal was to "invest the Funds in whatever legal manner it sees fit" during the thirty days until the contract expired on April 14, 1998. *Id.* at ¶¶ 2, 7. In exchange, Citadel was to receive a "minimum profit" in an amount equivalent to 52% of the transferred funds, every 6 days for the month-long duration of the agreement. *Id.* at ¶ 2. In addition, Citadel was to have been assigned permanent ownership of paintings held in a Japanese Museum as security for the funds. *Id.* at ¶ 4. Eleven million dollars were to have been returned to Citadel at the end of the contract's term. *Id.* at ¶ 3.

Instead, as discussed above, Equal breached the contract by immediately transferring the funds out of Equal's account, by failing to assign the paintings, by failing to make any payments to Citadel, and by failing to transfer $11 million to Citadel on May 14, 1998.

Count 3 alleges that Telesis and Hertzog converted Citadel's $11 million by transferring the funds from Equal to their own accounts, thereby exercising "rights of ownership over [the funds] to the exclusion of Citadel's rights as the rightful owner." Amd. Compl. ¶ 88. Then, the complaint alleges, the other defendants, who were "not bona fide purchasers for value," further converted the funds by accepting them from Telesis and Hertzog. Amd. Compl. ¶¶ 97–102, 106–113, 118–122.

Thus, the conversion claims against all the other defendants are derivative of the conversion claim against Hertzog and Telesis. In other words, if Hertzog and Telesis did not convert the funds when they transferred the money into their accounts, then the other defendants' ("derivative defendants") later receipt of funds from Hertzog and Telesis could not constitute conversion because Citadel would no longer have owned the funds when Telesis possessed them and transferred them on to the other defendants. Therefore, the inquiry begins with the initial transfer from Hertzog and Telesis.

### i. *Hertzog and Telesis*

Count 3 of the Amended Complaint alleges that "once the $5 million was in the Telesis Original Account [at Chase Manhattan Bank, having been transferred from Equal], without authority from Citadel, Telesis and Hertzog its officer assumed and exercised rights of ownership over it to the exclusion of Citadel's rights as the rightful owner" and converted Citadel's funds by making payments from the account. Amd. Compl. at ¶¶ 88, 89. New York courts have long recognized that corporate officers can be found liable for conversion if the act was committed on behalf of the corporation. *See, e.g., U.S. Metal & Coin Co. v. Burlock*, No. 84 Civ. 1166, 1985 WL 8043 *2 (E.D.N.Y.1985) (*citing Mendelson v. Boettger*, 257 A.D. 167, 171, 12 N.Y.S.2d 671 (N.Y.App.Div.1939), *aff'd*, 281 N.Y. 747, 23 N.E.2d 554 (1939)).

### aa. *Breach of Contract*

[37] This claim only accounts for what Hertzog and Telesis did with the funds they possessed as a result of breaching the contract with Equal, rather than stating an independent conversion claim. Hertzog and Telesis had no other duty other than that duty he took on as a principal of Equal in his contract with Citadel. Citadel would be fully compensated for its loss if it prevailed on a contract claim against Equal, so no additional damages would be warranted in conversion. *See Elma*, 2000 WL 297197, at *4. And in fact, Citadel has already prevailed in an English court and has been awarded over $40 million, *see Citadel Management Inc. v. Equal Ltd., et*

*al.,* 1998 C No 798 (Q.B. Oct. 14, 1998) a judgment that the Supreme Court of New York will enforce. *See Citadel Management, Inc. v. Hertzog,* 182 Misc.2d 902, 905, 906, 703 N.Y.S.2d 670, 671, 672 (Sup. 1999). Citadel tacitly admits that it is essentially seeking to enforce its contractual rights by referring to the Agreement as the source of its right to the funds. *See* Amd. Compl. ¶ 87; *Rolls–Royce Motor Cars Inc. v. Schudroff,* 929 F.Supp. 117, 124 (S.D.N.Y.1996). No separately actionable wrong was committed when Telesis transferred the funds to the other defendants. Citadel has failed to make out the first element of conversion.

### bb. *Ownership*

■ The law presumes that ownership lies with the person in possession of property or money. *See Northern Pac. R.R. Co. v. Lewis,* 162 U.S. 366, 372, 16 S.Ct. 831, 40 L.Ed. 1002 (1896) ("possession is prima facie evidence of some kind of rightful ownership or title."); *United States v. Wright,* 610 F.2d 930, 939 (D.C.Cir.1979). Where, as here, the funds were transferred "for the benefit of . . . Equal . . ., free and clear of all liens, interests, charges and encumbrances," Motion to Dismiss Ex. 6 ¶ 1, Equal, as the recipient of the funds, was free to treat the funds as it wished. "This sort of autonomy over property is one of the classic indicia of ownership." Bartell, 16 Bankr. Dev. J. at 317.

Whether this presumption holds depends in part on the nature of the transaction that led to possession. In this case, Citadel characterizes its agreement with Equal as an "investment against security" contract, whereas the defendants construe it as a loan. An investment contract is "one in which money is invested in a common enterprise with profits to come solely from the efforts of others, an agreement or transaction in which a party invests money in expectation of profits derived from the efforts of a promoter or other third party." Black's Law Dictionary 831 (7th ed.). Citadel alleges that Equal was to have invested the funds for Citadel's benefit. However, the contract does not so provide. In fact, the Agreement specifically states that Citadel transferred the funds "for the benefit of its client Equal Limited . . .," not for Citadel's own benefit. Agreement ¶ 1. Moreover, if Citadel's argument were true, Equal would have signed a contract that obliged it to assign permanent ownership of paintings in exchange for the opportunity to invest Citadel's money and then return both interest and principal, with no gain to itself.

■ Mensana's construction of the contract as a month-long loan with an usurious interest rate [5] is closer to the mark, in explaining both why the parties entered such an agreement, and why the contract was not honored. A "loan" of money is "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows." *Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co.,* 533 F.2d 290, 296 (5th Cir.1976) (*citing In re Grand Union Co.,* 219 F. 353, 356 (2d Cir.1914)). In the context of a loan, the presumption that ownership follows possession of money is irrebuttable. *See* Bartell, 16 Bankr.Dev. J. at 288. In other words, in transferring the funds to the debtor, the creditor relinquishes title and ownership over the funds in exchange for a claim for damages against the debtor in the amount of the loan when the loan becomes due. *Id.* at 286–87 ("Once physical possession of funds is transferred to the borrower or to a third party on the borrower's behalf, ownership transfers with it."). Thus, if the agreement was a loan as the defendants contend, Citadel did not have ownership over the funds when Equal transferred them, and therefore cannot assert a conversion claim.

---

**5.** As Mensana correctly calculates it, the four interest installments of 52% each over the life of the loan equal an annualized interest rate of approximately 2,500%.

However, the intent of the parties involved in the Agreement and the actual ownership of the funds when they were transferred to Equal and then to Telesis are fact questions that need not be resolved here. For the purpose of this motion, the facts as pled by the plaintiff are accepted as true. The Amended Complaint states that the defendants' exercise of authority over the funds violated Citadel's rights as "the rightful owner" (Amd. Compl.¶¶ 88, 101, 110, 121), and therefore properly pleads the ownership element of conversion.

### cc. *Unauthorized Dominion*

The Amended Complaint also properly pleads the "unauthorized dominion" element by alleging that the defendants, "without authority from Citadel, ... assumed and knowingly exercised rights of ownership over [the funds] to the exclusion of Citadel's rights as the rightful owner." Amd. Compl. at ¶¶ 88, 101, 110, 121.

### dd. *Specific and Identifiable Funds*

Even if Citadel had adequately pled some actionable wrong other than breach of contract, taking the facts alleged in the Amended Complaint as true, the funds in question are not "specifically identifiable." The Agreement provided for $11 million to be transferred into the Equal's solicitor's account at Barclay's Bank. The funds were not segregated or earmarked in a distinct account opened for the purpose of this transaction, but were transferred into the solicitor's general "client account." (Amd. Compl. ¶ 19; Agreement ¶ 1.) The Amended Complaint further alleges that $5 million was transferred from the solicitor's account into Hertzog's and Telesis's Chase Manhattan accounts, and itemizes subsequent expenditures from that account. Absent any claim that the funds were segregated in the solicitor's

account, the plaintiff has failed to allege that "specifically identifiable" funds were transferred without authorization. *See Double Alpha, Inc. v. Mako Partners, L.P.,* 99 Civ. 11541(DC), 2000 WL 1036034, *4 (S.D.N.Y. July 27, 2000) (dismissing for failure to state a conversion claim because "[a]lthough plaintiff alleges defendants owe it the specific sum of $610,674—the amount ... invested ... that has not been returned—it does not claim ownership to a specific, identifiable, segregated sum of money."); *The High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 429 (S.D.N.Y.1998) ("Because plaintiffs do not claim ownership of a specifically identifiable, segregated [$1 million] they fail to state a claim for conversion of money.") (internal quotations and citation omitted); *Massive Paper Mills v. Two–Ten Corp.,* 669 F.Supp. 94, 96 (S.D.N.Y.1987).

Moreover, although the Amended Complaint does allege the existing balance in the Telesis and Hertzog's Chase accounts when the $5 million transfer was made,[6] there is no allegation that the funds were in any manner segregated within the accounts while held there, which is a prerequisite to stating a claim for conversion against the derivative defendants. Finally, the Amended Complaint makes no allegation that the funds were specifically identifiable when held in the accounts of the derivative defendants.

### ee. *Obligation to Treat Funds in a Particular Manner*

Two contradictory provisions in the Agreement address whether the funds were to have been treated in any particular manner. On one hand, the Agreement provides that Citadel would transfer the funds "for the benefit of its client Equal ... free and clear of all liens, interests, charges and encumbrances." Agreement ¶ 1. On the other hand, the Agreement

---

6. *See* Amd. Compl. at ¶ 55 ("Prior to receipt of Citadel's funds into the Hertzog Original Account [No. 117–1–146861], Hertzog had $254.35 on deposit in this account."); ¶ 56

("Prior to receipt of Citadel's funds into the Telesis Original Account [No. 117 –1– 147232], Telesis had $898.59 on deposit.").

provides that the funds were so committed "in exchange for an agreement by Equal to invest the Funds in whatever legal manner it sees fit. . . ." Agreement ¶ 2.

Citadel has pled that the Agreement "required that such funds be invested for any lawful purpose." Amd. Compl. ¶ 86. Construing this claim in the light most favorable to Citadel, the Amended Complaint adequately pleads that the funds were to have been treated in a particular manner, in that they were to have been invested.

#### ff. *Notice of Unlawful Transfer*

The Amended Complaint also states that "[s]ince neither Hertzog nor Telesis had rights of ownership in any of Citadel's funds, anyone who assumed control over such funds equally had no rights of ownership unless they were a bona fide purchasers for value without knowledge." Amd. Compl. ¶ 98. With regard to Tyson, the Amended Complaint sufficiently pleads the notice element by stating that "Tyson, despite actions taken against Hertzog, of which she knew or should have known, never returned the funds she received to Citadel." Amd. Compl. ¶ 100.

However, with regard to Sullivan, Mensana and Brite, the Amended Complaint alleges only that they "knowingly exercised rights of ownership over [the funds] to the exclusion of Citadel's rights as the rightful owner." Amd. Compl. ¶¶ 110, 121. However, merely alleging that defendants "knowingly" used funds does not adequately plead that they used the funds with knowledge that they had been converted by Telesis. Citadel has failed to plead the notice element of conversion with regard to Sullivan, Mensana and Brite.

For the aforementioned reasons, Citadel has failed to state a claim for conversion against Telesis and Hertzog. Because Counts IV–VI are derivative of Count III and suffer from the same and additional pleading deficiencies, they will also be dismissed pursuant to Rule 12(b)(6).

#### ii. *Brite*

The claim against Brite should be dismissed for one additional reason. The Amended Complaint alleges that Brite is liable for conversion "in the event that any of Citadel's funds were transferred to Brite." (Amd. Compl. at ¶ 118.) In addition to the shortcomings stated above, this pleading fails to allege any facts sufficient to state a case or controversy against Brite. In order for a plaintiff to have standing on any particular claim, the plaintiff must have suffered an "injury in fact" that is neither "conjectural" nor "hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Here, the claim against Brite is based upon mere speculation. In addition to the aforementioned reasons, Count VI will be dismissed because it does not present a controversy against Brite.

The conversion claims will be dismissed without prejudice. Citadel is granted leave to refile.

#### 2. *The Federal RICO Claims Will Be Dismissed with Prejudice*

Count XII claims that Hertzog, Telesis, Mensana and Sullivan violated 18 U.S.C. § 1962(b) by engaging in a pattern of racketeering activity. Count XIII claims that Hertzog, Telesis, Brite, Tyson, Mensana and Sullivan violated 18 U.S.C. § 1962(c) by being employed by or associated with an enterprise engaged in a pattern of racketeering activity. Count XIV claims that Hertzog, Telesis, Mensana and Sullivan violated 18 U.S.C. § 1962(d), by conspiring to engage in a pattern of racketeering activity.

For the reasons stated below, all three RICO claims will be dismissed with prejudice.

#### a. *Citadel Lacks Standing*

Citadel does not have standing to bring a RICO action because it has failed to make the requisite claim that its injury was caused by the defendants' alleged acts

of racketeering. *See Laborers Local 17 Health and Benefit Fund v. Philip Morris*, 191 F.3d 229, 235 (2d Cir.1999) (*citing Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

### i. *Injury*

Before an injury's cause may be identified, it is necessary to define the injury itself. In its memoranda, Citadel defines its injury it as "Equal's failure to return Citadel's funds." (Cit. Resp. Br. at 13.) As discussed above, whether this characterization is accurate depends on whether Citadel retained ownership of the funds after transferring them to Equal pursuant to the contract. The defendants construe the contract as a loan in which Citadel relinquished ownership of the funds to Equal in exchange for Equal's promise to pay interest and principal one month later. Under the defendants' view, the injury was the breach of contract and took place when Equal failed to transfer ownership of the paintings as security, failed to provide regular interest payments, and failed to transfer $11 million (or any funds) to Citadel at the end of the contract's term. *See* discussion, *supra.*

In contrast, Citadel construes it as an "investment contract" in which the $11 million were to remain "Citadel's funds" while Equal invested them on Citadel's behalf. Under Citadel's view, the injury took place when Equal transferred Citadel's funds to Telesis without seeking Citadel's authority, thereby depriving Citadel of the use of its funds. *See* Cit. Resp. Br. at 12.

### ii. *Causation*

As discussed above, due to the nature of the contract and the fact that the funds were not specifically identifiable as held in Equal's account, Citadel no longer had ownership of the funds at the time they were transferred to Telesis. Its claim is essentially one for breach of contract against Equal, and Citadel's injury was complete when Equal wired the funds to Telesis, rendering Equal financially unable to honor the contract. Citadel can point to no provision in either the Amended Complaint or the RICO statement in which it alleges that any act by any of the defendants caused its injury, *see generally* Cit. Resp. Br., and, in fact, none exists. No subsequent transfer of funds or purported "racketeering activities" by any other defendant could have "caused" Citadel's injury after Equal had already disbursed the money.

Citadel also argues that its "injury would not have occurred without transfer by Mensana of the $4 million to IIC" in violation of the May 7, 1998 Mareva Injunction. (*See* Amd. Compl. ¶¶ 176–179; Cit. Resp. Br. at 14.) However, "[a]n act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act," in that the former scenario properly forms the predicate for a RICO claim, whereas the latter does not. *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 587 (S.D.N.Y.1995).

Citadel is correct in arguing that it would have had the opportunity for legal redress at the Mareva Injunction confirmation hearing if the funds had not been transferred out of the custody of the named defendants in the English action on the eve of that hearing. However, even if the subsequent transfers made it more difficult for Citadel to seek redress for the injury Equal caused, they did not in and of themselves cause the injury within the meaning of the RICO statute. The violation of the Mareva Injunction, even if it compounded Citadel's previous injury, is an offense against the issuing court that is punishable with contempt and sanctions rather than an act that gives rise to an independent cause of action by Citadel. *See, e.g., Gompers v. United States*, 233 U.S. 604, 609, 34 S.Ct. 693, 695, 58 L.Ed. 1115 (1914) (discussing English courts'

longstanding common law contempt power); *D. Patrick Inc. v.. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir.1993) .("there is no such thing as an independent cause of action for civil contempt") (*quoting Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir.1988)).

 In addition, Citadel has failed to plead the required element of reliance on a misrepresentation by the defendants to support its claim that the defendant's alleged acts of wire fraud caused its injury. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169–170 (2d Cir.1999); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir. 1992) ("to establish the required causal connection, the plaintiff [is] required to demonstrate that the defendant's misrepresentations were relied on"); *Odyssey Re (London) Limited v. Stirling Cooke Brown Holdings Limited*, 85 F.Supp.2d 282, 303 (S.D.N.Y.2000) (dismissing RICO claim for failure to allege reliance); *Feeley v. Whitman Corp.*, 65 F.Supp.2d 164, 174 (S.D.N.Y.1999) (same).

By filing these RICO claims, Citadel is attempting to transform what is an "elegantly simply two-party contract dispute into a dizzily complex multi-party tort litigation." *Rolls Royce*, 929 F.Supp. at 120. Yet Citadel has failed to plead the causal or reliance elements required to establish standing to bring a RICO claim against any of the defendants. Therefore the federal RICO claims will be dismissed in their entirety.

### b. Citadel Cannot Make Out a Federal RICO Claim

Because it appears beyond doubt that Citadel prove no set of facts in support of any of its three RICO claims which would entitle it to relief even if it did have standing, *see Harris v. City of New York*, 186 F.3d at 250, the RICO claims will be dismissed with prejudice. The deficient RICO elements are set forth briefly below.

### i. § 1962(b) and (c)

 To state a RICO claim under § 1962(b) and (c), a plaintiff must plead seven elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983) (*quoting* 18 U.S.C. §§ 1962(a)-(c)); *see Scheiner v. Wallace*, 832 F.Supp. 687, 699 (S.D.N.Y.1993). "In considering RICO claims, courts must attempt to achieve results 'consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime.'" *Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 346 (S.D.N.Y.1998).

### aa. Predicate Acts of Racketeering

 The RICO statute defines "racketeering activity" as comprising enumerated crimes, including wire fraud as alleged in this case. 18 U.S.C. § 1961(1); 18 U.S.C. § 1343 (wire fraud). A plaintiff alleging wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate wire communications in furtherance of the scheme. *See S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996).

 Moreover, because Citadel alleges wire fraud as the predicate acts, the Amended Complaint must comport with Fed.R.Civ.P. Rule 9(b), which requires plaintiffs to plead the circumstances of the fraud with particularity. *See Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989) (stating Rule 9(b) requirement that "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."); *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F.Supp.

276, 281 (S.D.N.Y.1991) ("All of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions") (citation and internal quotations omitted).

 Given the difficulty in pleading a defendant's state of mind with specificity, Rule 9(b) requires that a plaintiff plead the intent element of fraud only in general terms. *See Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995). This standard may be satisfied by pleading either that the defendants engaged in consciously fraudulent behavior, or that they had motive and a "clear opportunity" to commit fraud. *Id.*

 Finally, where, as here, more than one defendant is charged with fraud, the Amended Complaint must particularize each defendant's alleged participation in the fraud. *See Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) ("where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); *Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y. 1998). In the context of a RICO claim, each defendant must be alleged to have engaged in two or more predicate acts. *See Lakonia Management Ltd. v. Meriwether,* 106 F.Supp.2d 540, 550 (S.D.N.Y. 2000) (RICO complaint must allege that each defendant committed at least two predicate acts of racketeering); *Moeller v. Zaccaria,* 831 F.Supp. 1046, 1056 (S.D.N.Y.1993) (same).

 There is no set of facts under which Citadel would be able to make out a colorable claim on the first two elements of fraud: that the defendants were intentionally engaged in a scheme to defraud. Although the Amended Complaint does allege that the defendants used the wires to transfer funds and to transmit facsimiles, there is no showing of a nexus of knowledge between these transfers that would be sufficient to support a claim that there

was a collective enterprise engaging in a common scheme to defraud Citadel. The complaint fails to allege in even cursory fashion that any defendant other than Hertzog had knowledge of the origin of the funds, or that there was any question as to the lawfulness of the transfers, much less an intent to defraud. Hertzog and Telesis are the only defendants in this action who were defendants in the Mareva Injunction. Amd. Compl. ¶ 26. Because none of the other defendants in this action were involved in the English action, they cannot be charged with knowledge that the funds transfers they received were in any way unlawful.

#### bb. *Pattern*

 Even if Citadel could allege the predicate criminal acts, it could not establish a pattern by making the requisite showing that the defendants' acts are "related, and that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The continuity necessary to establish a pattern may be either "closed-ended" or "open-ended." Closed-ended continuity involves acts occurring over a "substantial" amount of time, which the Supreme Court has defined as including periods of more than a few months. *See id.,* 492 U.S. at 242, 109 S.Ct. 2893. The Second Circuit has never found that activity continuing for less than two years is substantial under this rule. *See Cofacredit,* 187 F.3d at 242. Here, Citadel concedes that the defendants' alleged racketeering acts took place "within a period of less than two years." Amd. Compl. ¶¶ 191, 215. In fact, the life of the racketeering activity is measured by the predicate acts, which, in this case, range only from April 1998 to February 1999, less than one year. Amd. Compl. ¶¶ 172–188; *see H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. There is no closed-ended continuity.

 Open-ended continuity does not require a substantial temporal show-

ing, but requires a plaintiff to show a threat of ongoing criminal activity beyond the period in which the predicate acts were committed. *See Cofacredit,* 187 F.3d at 242. Citadel argues that the defendants' allegedly criminal conduct will inherently continue until Citadel is made whole. Cit. Resp. Br. at 18. However, the fact that the complainant has not recovered its contractual loss is simply not sufficient to prove the threat of future criminal acts by the defendants. *Cf. Perlman v. Zell,* 185 F.3d 850, 853 (7th Cir.1999) ("breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO.")

Counts XII and XIII will be dismissed with prejudice.

### iii. *§ 1962(d)*

In order to establish a violation of § 1962(d), the Supreme Court has held that a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...." *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244–45 (2d Cir.1999). In other words, a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996).

Count XIV will be dismissed with prejudice.

### Conclusion

For the aforementioned reasons, the default motion is granted as to Telesis and denied as to Tyson. The Amended Complaint will be dismissed, and the plaintiff is granted leave to refile in accordance with this opinion.

It is so ordered.